Lynde *v.* Lynde.

MARY W. LYNDE, petitioner,

*v.*

CHARLES W. LYNDE, defendant.

On petition of MARY W. LYNDE, the petitioner above named,

*v.*

JAMES WESTERVELT, respondent.

[Filed July 7th, 1902.]

1. A solicitor in chancery of this state, who was also an attorney and counsellor-at-law of the State of New York, was employed to take proceedings in chancery for the recovery of permanent alimony on a divorce *a vinculo matrimonii* theretofore granted by that court. The proceedings

Lynde *v.* Lynde.

were taken, resulting in a decree in chancery against the former husband for a considerable sum of money for alimony accrued, and requiring him thereafter to pay permanent alimony to the former wife at a stated sum per week. The defendant being a resident of New York, the solicitor in his capacity as an attorney-at-law of that state, brought suits there against the former husband to recover the arrears of alimony mentioned in the decree and certain installments which had thereafter fallen due. The litigation was settled in New York and a general release was given by the former wife to the former husband, discharging him from all claims for alimony, past and future. In the settlement her solicitor and attorney received for her account a large sum of money, being the consideration of the settlement and release. The solicitor retained this money, or a large share of it, and refused to pay it over to his client.— *Held*, that the court of chancery has jurisdiction to exercise its summary power over the solicitor as an officer of the court, in order to require him to do justice to his client.

2. A wife's claim for an allowance of permanent alimony, on a divorce *a vinculo*, is a purely personal right and not a property right. Alimony to be allowed and paid *in futuro* is intended for the personal benefit and support of the wife, and in its nature is not susceptible of assignment by the wife to another, nor capable of being enjoyed by her in anticipation.

3. A contract between a wife and her solicitor, providing that for his services in procuring an allowance of alimony and enforcing its payment he shall receive a share of the alimony recovered, is void not only because the claim for alimony is incapable of assignment, but also because the contract is in contravention of public policy.

On appeal from an order advised by Vice-Chancellor Reed, who delivered the following conclusions:

The right of this court to take control of this matter is challenged by the respondent upon the ground that the money in his hands was not raised in any proceeding in this court, but by actions in the courts of the State of New York.

It is to be observed that the moneys came to the respondent by the terms of a settlement, and that this settlement included not merely a release by the petitioner of all her rights in the judgments obtained in New York, but of all rights, past and future, under the decree made by this court. As solicitor in the suit in which the decree satisfied by this settlement was made, I am of the opinion that he is amenable to this court for his conduct in dealing with the money so received.

It is not a question whether, as an attorney of the State of

New York, his conduct in the New York actions is also the subject of judicial supervision there.

Assuming that this court has the right to take control of this matter, and order the respondent to pay to the petitioner such portion of the moneys in his hands as remains after deducting a reasonable compensation for his services, the question remains, should this court exercise that power in this case?

The ground upon which a court moves in matters of this kind is stated by Mr. Justice Dixon, in delivering his opinion for the court of errors and appeals, in *Strong & Sons* v. *Mundy, 7 Dick. Ch. Rep. 833.* "The right to proceed summarily against an attorney arises from his dishonest and oppressive or clearly illegal conduct. If it appears that there exists between a lawyer and his client a fair dispute, which can be decided only on the settlement of doubtful questions of fact or law, the court should not exercise its summary power, but should leave the parties to their ordinary remedies." Among the cases cited in support of this statement of the law is *In re Paschal, 10 Wall. 483,* in which Mr. Justice Bradley, for the supreme court of the United States, said: "If an attorney has collected money for his client, it is, *prima facie,* his duty, after deducting his own costs and disbursements, to pay it over to such client; and his refusal to do so, without some good excuse, is gross misconduct and dishonesty on his part, calculated to bring discredit on the court and on the administration of justice. It is this misconduct on which the court seizes as a ground of jurisdiction to compel him to pay the money in conformity with his professional duty. The application against him in such cases is not equivalent to an action of tort or assumpsit, but it is a *quasi* criminal proceeding, in which the question is not whether the attorney has received the money, but whether he has acted improperly or dishonestly in not paying it over. If no dishonesty appears, the party will be left to his action at law."

Tested by the doctrine thus enunciated, I am of the opinion that the facts displayed do not present a case for the exercise of the summary power of this court. While it is true that in the absence of a contract an attorney who agrees to enforce a right or collect a claim, in consideration of a certain sum or of a per-

centage upon the amount recovered, must pay out of the sum mentioned, or out of his proportion thereof, for the services of any counsel employed by him, it is equally true that if such counsel is employed by the client of the attorney, or by the attorney himself at the client's request, under an arrangement that the counsel shall be first paid out of the gross amount recovered, the attorney cannot be compelled to pay the counsel's fees.

The question, then, is one, the solution of which depends upon conflicting testimony—the petitioner denying and the respondent asserting the existence of an agreement that the counsel should be paid out of the sum recovered. There is nothing illegal in such a contract, and the only question is whether such a contract existed. The appropriate forum for the adjudication of the rights of the parties is a court of law. The petition must be dismissed.

*Mr. John M. Dickinson* and *Mr. Edwin Robert Walker,* for Mary W. Lynde, appellant.

*Mr. Richard V. Lindabury,* for James Westervelt, respondent.

The opinion of the court was delivered by

PITNEY, J.

This is an appeal by Mrs. Lynde from an order made by the court of chancery dismissing a petition filed by her, in that court, wherein she prayed that the respondent, James Westervelt, who was her solicitor in the main cause, should be required to pay into court the sum of $38,500, which he had received from the defendant in the cause in settlement of a controversy about alimony, so that out of the said sum a reasonable fee might be fixed and allowed to the solicitor for his services rendered to her, and the balance of the moneys might be paid to Mrs. Lynde.

The learned vice-chancellor who heard the matter refused the relief prayed for by Mrs. Lynde, on the ground that the facts shown did not warrant the exercise of the summary power of the court over a solicitor.

The undisputed facts are as follows:

In the year 1893 Mrs. Lynde obtained, in the court of chancery, a decree of divorce *a vinculo matrimonii*. This decree, through inadvertence in its preparation, made no provision for the allowance of alimony. In the month of January, 1896, Mrs. Lynde, for the first time, met Westervelt, who was an attorney-at-law and solicitor in chancery of this state, and was also an attorney and counsellor of the State of New York. She employed him to take proceedings in her behalf to recover alimony from her former husband. According to her insistment no express agreement was made between her and Westervelt as to his compensation. He sets up an alleged agreement for a contingent fee based upon the amount of the recovery. This question will be dealt with hereafter.

Whatever may have been the terms of the employment, it appears that, on the 11th day of February, 1896, Westervelt, as her solicitor, filed a petition in the court of chancery, praying that the decree of divorce be opened and that it be amended by decreeing an allowance of alimony to Mrs. Lynde. To this petition her former husband, Charles W. Lynde, made appearance, and, after litigation, the court of chancery decided (*Lynde* v. *Lynde, 9 Dick. Ch. Rep. 473*) to permit Mrs. Lynde to make application, at the foot of the decree, for an allowance of alimony. From the order of the chancellor thus made an appeal was taken, and the order was affirmed by this court. *10 Dick. Ch. Rep. 591.* Thereupon further proceedings were had in the court of chancery, resulting in the making of a decree, on December 28th, 1897, whereby it was adjudged and decreed that the said Charles W. Lynde should pay to Mrs. Lynde the sum of $7,840 for alimony accrued from the filing of her petition to the date of the decree; a counsel fee of $1,000, and her costs of suit, taxed at $136.07, amounting, in the aggregate, to $8,976.07; and the decree also required him to pay to her thereafter the sum of $80 per week, from the date of the decree, as permanent alimony. The defendant, Lynde, was a resident of the State of New York. A receiver appointed by the chancellor was unable to obtain possession of any property of his in New Jersey in order to enforce the provisions of the decree. It therefore became necessary to

take proceedings in the State of New York to enforce the payment of the accrued alimony mentioned in the decree of December 28th, 1897, and to fasten upon Mr. Lynde the liability for alimony thereafter to accrue. For this purpose Westervelt began an action in the supreme court of New York, which, after trial, resulted in a money judgment in Mrs. Lynde's favor against her former husband for the amount of the alimony, counsel fee and costs specified in the New Jersey decree, and also for alimony at $80 per week from the date of that decree until the entry of judgment in the New York suit, which was in the month of January, 1899. The money judgment amounted, with costs, to $14,896.03. The same judgment directed the defendant to pay alimony to Mrs. Lynde thereafter at the rate of $80 per week. On appeal from that judgment by the defendant the appellate division of the supreme court of the State of New York modified the judgment by reducing the amount of the recovery to the sum of $8,840, with interest and costs, and by abrogating the equitable relief. *Lynde* v. *Lynde, 41 N. Y. App. Div. 280; 48 L. R. A. 679; 58 N. Y. Supr. Ct. 567.*

Thereupon Westervelt instituted three additional actions in the supreme court of New York, in each of which the relief asked was a money judgment for sundry installments of alimony that had fallen due since the decree of December 28th, 1897.

About the same time both parties appealed from the decision of the appellate division to the court of appeals, and that court, in the month of April, 1900, affirmed the judgment of the appellate division in all respects. *Lynde* v. *Lynde, 162 N. Y. 405.* Thereupon each party sued out a writ of error from the United States supreme court, and in that court the judgment of the New York court of appeals was affirmed. *Lynde* v. *Lynde, 181 U. S. 183.* This decision was rendered April 15th, 1901. Shortly thereafter a fifth action was commenced by Westervelt for Mrs. Lynde against her former husband in the State of New York. Its purpose does not appear, but presumably it was intended to recover an additional installment of alimony.

During the months of May, June and July, 1901, negotiations for settlement were in progress, which finally reached a conclusion on the 12th day of July. It was closed by Westervelt with

the opposing attorneys, in Mrs. Lynde's absence, but with her consent so far as the terms of settlement were concerned. In the settlement Westervelt received Charles W. Lynde's check for $38,500, payable to Mrs. Lynde's order, and also his note, to her order, for $2,500, payable in eight months upon condition that she should, if required, make deposition in court concerning a fact which, by the parties, was considered material in the settlement. For this consideration Mrs. Lynde released her husband from "all claims against him for or on account of any alimony or maintenance, past or future;" the New Jersey decree of December 28th, 1897, and the New York judgment were both satisfied of record, and all pending actions were discontinued. It should be observed in passing that the New York judgment, as modified on appeal, was for only $8,840, besides costs, and represented the alimony and counsel fee adjudged due to Mrs. Lynde by the New Jersey decree. The residue of the $41,000 was paid, or agreed to be paid, by Charles W. Lynde for Mrs. Lynde's release of her pending actions for alimony from December 28th, 1897, to July 12th, 1901, and of her claim for future alimony.

As soon as the settlement was closed, Westervelt endorsed the $38,500 check in Mrs. Lynde's name, and deposited it to the credit of his own account in bank. This endorsement was made under a power of attorney that Mrs. Lynde had given him on the same day, in anticipation of the settlement. Whether he had a right to use the power of attorney for this purpose is one of the questions arising in the present inquiry.

Having thus obtained possession of the $38,500, Westervelt notified Mrs. Lynde by letter that the settlement had been closed at $41,000 (this, of course, included the $2,500 note), and that her share would be about $19,000; promising to send a statement and forward her share at an early day. This notification brought Mrs. Lynde to his office, accompanied by one of her present counsel, and a somewhat heated interview took place, during which she strenuously objected to the charges proposed to be made by Westervelt. A few days later he sent her by mail a statement made up entirely in accordance with his own insistment, charging her $15,000 as his own fee for professional services, $4,900 for fees of Mr. George H. Bruce and Messrs. Gayley

Lynde v. Lynde.

& Fleming, who had been employed as counsel in the litigation, and the further sum of $2,513.21 claimed to be due to Westervelt for taxed costs and disbursements; the charges amounting in all to $22,413.21, and showing a balance due from him to her, according to his own contention, amounting to $16,086.79. For the latter amount Westervelt sent her his check, made out to her order, on the face of which were written the words: "In full of all claims *In re Lynde* v. *Lynde* or otherwise." At the same time he sent her the conditional note for $2,500 signed by her husband.

Mrs. Lynde refused to accept this check and note as payment in full from Westervelt, and thereupon filed her petition in the court of chancery invoking the aid of that court against him. This petition sets forth with some particularity the transactions alleged to have taken place between her and Westervelt, and prays that the money received by him as above mentioned may be forthwith paid into court to await the further order of the court; that out of that money a just and reasonable fee may be fixed and allowed to him for his services, and that the balance of the moneys so received may be paid to her. The petition is verified by her affidavit, and contains charges of improper and oppressive conduct on the part of Westervelt in the following respects, viz.:

(*a*) Improper conduct in securing possession of the money paid by Lynde upon the settlement; the averment being that in anticipation of the settlement Westervelt had induced her to give him a general power of attorney to endorse checks by false representations as to the purpose for which he intended to use it.

(*b*) That Westervelt, on obtaining the money, unjustly retained from it the charges above mentioned, aggregating $22,-413.21. She avers that Westervelt's charges were exorbitant and unconscionable; that she had never entered into any contract or agreement entitling him to retain such charges, and that she had not employed Mr. Bruce and Messrs. Gayley & Fleming, nor entered into any agreement with them.

(*c*) And the further charge that upon a dispute arising between Mrs. Lynde and Westervelt, with respect to his charges, he had sent her a check for the amount conceded by him to be

due to her ($16,086.79), on the face of which were written the words: "In full of all claims *In re Lynde* v. *Lynde* or otherwise;" so that she could not draw the money without admitting that she had no further claim against him.

Upon the filing of her petition and affidavit an order was made by the court of chancery requiring Westervelt to show cause why the prayer of the petition should not be granted. He appeared and filed an answer to the petition, accompanied by voluminous affidavits purporting to give a circumstantial account of the transactions in question.

He admits receipt of the proceeds of settlement, gives an account of the circumstances under which he obtained from her the power of attorney, which does not differ materially from her account of the matter, and admits without qualification the third charge above specified. At the same time he attempts to justify the fee of $15,000 charged for his own services on the ground that at the time he was employed by Mrs. Lynde an express agreement was made between them to the effect that he should take proceedings in her behalf seeking to recover alimony from her husband, that she should pay the disbursements incident to such proceedings, and that for his services he should receive a fee contingent upon the recovery of alimony and proportionate to the amount recovered, to wit, one-third of the recovery if the matter did not involve protracted litigation or many appeals or an unusual amount of work; otherwise one-half of the recovery. He also says that some time after the commencement of his employment Mrs. Lynde authorized the employment of associate counsel, whose fees were to be paid by her out of the gross recovery, before division thereof under the contract between her and Westervelt. The charge of $4,900 for counsel fees of associates is justified under this agreement. The charge of $2,513.21 is claimed to be due to Westervelt for taxed costs and disbursements; how much of this amount represents disbursements and how much attorney's or solicitor's fees is not stated.

The case was disposed of by the learned vice-chancellor upon the petition and answer, and the *ex parte* affidavits.

Before proceeding to a consideration of the merits, a question of jurisdiction requires to be dealt with.

Lynde *v.* Lynde.

The fundamental ground upon which rests the jurisdiction that is invoked in the present case is that attorneys and solicitors are officers of the respective courts in which they practice. They, like judges, clerks and sheriffs, are a part of the machinery of the law created for the administration of justice. It is obvious that justice is not executed by the entry of a judgment or the making of a decree in favor of one suitor and against another; nor is it completely executed when the defeated suitor is required to discharge the liability thus imposed. If payment is made by him to the opposing solicitor, it is made to an officer of the court, and, in a broad sense, is paid into court, as truly so as if paid to the clerk. In order completely to execute justice, it still remains for that officer's just compensation to be paid and for the successful suitor to be dismissed with the net avails of the litigation.

It is on the ground of this relation that courts of justice, in favor of their officers, enforce a lien upon moneys, papers and documents that have come to their hands in the course of their duties to secure the payment of their fees. It is on the same ground that courts enforce the equitable rights of an attorney or solicitor against the proceeds of a judgment or decree not yet collected. And it is upon this ground that, when it appears that an attorney or solicitor has received, in his capacity as an officer of the court, any moneys which his duty requires him to pay over to the client, the court, if necessary, exercises its summary, disciplinary, punitive powers to require the attorney or solicitor to do justice to the client. Illustrative cases are numerous. *Phillips* v. *MacKay, 25 Vr. 319; Strong* v. *Mundy, 7 Dick. Ch. Rep. 833; Delaney* v. *Husband, 35 Vr. 275; Bowling Green Savings Bank* v. *Todd, 52 N. Y. 489; Mercer* v. *Graves (1872), L. R. 7 Q. B. 499; In re Freston (1883), L. R. 11 Q. B. Div. 545; In re Dudley (1883), L. R. 12 Q. B. Div. 44; In re Grey (1892), 2 Q. B. Div. 440.*

In the present case Westervelt, in his answer, denies that the moneys in question were collected by him as a solicitor of the court of chancery or by virtue of any proceedings in that court, and alleges that the moneys were paid and collected by virtue of the actions that were brought by him for Mrs. Lynde in the supreme court of the State of New York. In his affidavit he says

that the settlement which resulted in the payment of the money was in no sense due to any proceedings in the court of chancery, except in so far as the decree of that court formed the basis of the several actions in the New York courts; that the moneys in question were not collected by him as an officer of the court of chancery, but as an attorney and counsellor of New York, in suits begun and concluded in New York.

It has, however, been repeatedly held that the summary jurisdiction of the court over attorneys and solicitors is not even confined to matters arising out of litigation, but extends to any case "where the employment is so connected with his professional character as to afford a presumption that his character formed the ground of his employment by the client." Such is the language of Chief-Justice Abbott, in *In re Aitkin* (*1820*), *4 Barn. & Ald. 47.* See, also, *In re Knight* (*1822*), *1 Bing. 91; In re Gee* (*1845*), *2 Dowl. & L. 997; In re Fairlhorne* (*1846*), *3 Dowl. & L. 548.*

Nor will the court desist from requiring its own attorney to do his duty simply because the transaction in question arose in litigation in another court. *Ex parte Bodenham* (*1838*), *8 Adolph. & E. 959; In re Greaves* (*1827*), *1 Cromp. & J. 374, note; In re Paterson* (*1832*), *1 Dowl. Pr. 468; Batterson* v. *Osborne, 18 N. Y. Supp. 431.*

Nor from requiring an attorney to perform his duty, although he be the attorney of another court, practicing in the court which exercises the summary jurisdiction. *Evans* v. *Duncombe* (*1831*), *1 Cromp. & J. 372, 1 Tyrw. 283; Thompson* v. *Gordon* (*1846*), *15 Mees. & W. 611* (*per Alderson, B.*).

It is therefore deemed a matter of no practical consequence that, after the conclusion of the judicial proceedings in this state, litigation ensued in the State of New York, in which Mr. Westervelt appeared by virtue of his office as an attorney-at-law of that state. The foundation of Mrs. Lynde's claim was in New Jersey. The court of chancery had jurisdiction to decree alimony as incidental to the divorce. The money was paid in settlement of that decree, both with respect to alimony already accrued and with respect to the duty to pay alimony thereafter. And, so far as appears, no judgment was rendered in any of the New York

Lynde *v.* Lynde.

actions fixing the liability of Mr. Lynde, by the rendition of a money judgment, in any amount beyond that which had accrued prior to the making of the decree in the court of chancery. But, above all, the money came to Mr. Westervelt's hands by virtue of his original employment as a solicitor in chancery. Except for his holding that office, he would not have been concerned in the matter.

At this point it is further objected that Mr. Westervelt holds his commission to practice in this state, not from the court of chancery, but from the supreme court, to which court alone, it is said, he is amenable generally for his professional acts, wherever performed. This objection is without force. It does not even raise the question whether attorneys of the supreme court, by virtue of that commission, have a right to appear as solicitors in the court of chancery. In this state, while there is a recognized distinction between the functions of an attorney-at-law and those of a solicitor in chancery, yet it is the practice, and has been so from time immemorial, that examinations for admission are held under the auspices of the supreme court, the successful candidates being commissioned by the governor as both attorneys and solicitors. But it is, as we conceive, quite immaterial, for the present purpose, whence Mr. Westervelt derived his authority to appear generally as a solicitor in chancery, or whether he had such authority. He admittedly accepted Mrs. Lynde's retainer to appear for her in that capacity, and did so appear. In consequence of that retainer and appearance he finally received the proceeds of the settlement, 'and he is therefore fully amenable to the summary jurisdiction of the court of chancery in the premises. This position is fully sustained by the authorities, already cited, as well as by the reason of the matter.

Turning now to the merits, we perceive that Mr. Westervelt is in possession of a large sum of money received in settlement of Mrs. Lynde's claim for alimony, past and future; that he asserts a lien upon this money for the amount of the fees and charges already mentioned, and that these fees and charges are justified upon the basis of an express agreement alleged to have been made before the commencement of the proceedings that resulted in the decree for alimony, by which agreement the solicitor was entitled to a large share of the amount recovered.

As already mentioned, Mrs. Lynde denies the making of this agreement. The circumstances of its alleged making, as disclosed by the answer and annexed affidavits, were as follows: Mrs. Lynde at the time resided in Trenton, and occupied a position of clerical employment there.   Westervelt lived at Montclair, in this state, and had his office in the city of New York.  He had been admitted to the bar of New Jersey in the month of June, 1895, as an attorney-at-law and solicitor in chancery.  He was not admitted as a counsellor in this state until the year 1900.  He was introduced to Mrs. Lynde, in the month of January, 1896, by one Ball, a New York lawyer of eighteen years' standing, whose office was in a room adjoining that of Westervelt.  Ball himself was a stranger to Mrs. Lynde.   The circumstances of the introduction are detailed in the affidavits of Ball and of Westervelt.   Ball swears that he is connected by marriage with the family of Charles W. Lynde, the defendant; that in his capacity as attorney for the sister of Lynde's father, upon the settlement of the estate of the father, Ball obtained information with reference to the rights and interests of Mrs. Lynde and of Charles W. Lynde; that he wrote to Mrs. Lynde, telling her that she had certain rights and interests which ought to be protected; that shortly thereafter she called at Ball's office and he had an interview with her and informed her of the facts out of which grew the proceedings thereafter taken in her behalf by Westervelt; that Mrs. Lynde requested him (Ball) to act as her attorney in obtaining her rights as against Mr. Lynde; that Ball thereupon explained to her that the proceedings necessary to be taken to obtain her rights would, in the first instance, require the services of a New Jersey attorney, and that he therefore could not personally act for her; but he informed her that he could refer her to a friend, who was a member of the New Jersey bar, who could act for her as attorney, and that he (Ball) would aid her by furnishing any information that was within his power; that Mrs. Lynde thereupon requested Ball to introduce her to said New Jersey attorney, and he complied, and introduced her to Westervelt; that Ball was present during the interview which ensued between Mrs. Lynde and Westervelt, and that in the course of that interview the agreement already

referred to was made between Mrs. Lynde and Westervelt. Westervelt himself gives a sworn account of the interview, which agrees substantially with that given by Ball. He also says it was he (Westervelt) who suggested taking up the case on a contingent fee; that Mrs. Lynde asked how much that would be, and that he replied that it was usual in such cases to charge from one-third to one-half; whereupon she agreed.

In what we shall hereafter say upon another topic, we must not be understood as in anywise approving the methods by which this agreement was procured, or assenting to the notion that such an agreement, made under such circumstances, would, in any event, be sustained. A client inexperienced in business, coming in response to an invitation, apparently reposing entire confidence in the lawyers and desiring their aid because of the information they possess, at the first interview, makes an agreement binding her to pay, in the event of a successful outcome of the litigation, a fee equal to one-third or one-half the amount recovered. On the lawyer's own story, the client accepted without question his statement as to the share customarily charged as a contingent fee. It would at the least seem that under such circumstances the burden would rest upon the attorney to show that the bargain was a fair one for the client. The late Chief-Justice Beasley, in an opinion holding that because of the non-adoption in this state of the law of champerty and maintenance, a contract between attorney and client providing for a contingent fee, proportioned to the amount of the recovery, was not necessarily void, at the same time said: "Such contracts will be inspected with jealous vigilance by the courts on account of the delicacy of the relationship of the parties to them, and the most transparent candor and good faith are required on the part of the attorney in these dealings with his client." *Schomp* v. *Schenck, 11 Vr. 195, 200.* And although the case cited by him related to a transaction occurring *pendente lite,* the same rule has been frequently applied to transactions occurring at or even before the employment of the attorney; the inquiry being whether there existed in fact a relation of trust and confidence between the parties. *Arden* v. *Patterson, 5 Johns. Ch. 44 (per Chancel-*

*lor Kent)* ; *Allison* v. *Mills, 26 Conn. 213; Taylor* v. *Bemiss, 110 U. S. 42 (per Miller, J.,* at *p. 45)* ; *Ex parte Plitt, 2 Wall. Jr. 453 (1853) (per Grier, J.,* at *p. 476; per Kane, J.,* at *p. 480)* ; *Foster* v. *Jack, 4 Watts 335 (1835) (per Chief-Justice Gibson,* at *p. 339)* ; *County of Chester* v. *Barber, 97 Pa. St. 455 (1881) (per Paxson, J.,* at *p. 463)* ; *Brown* v. *Bulkley, 1 McCart. 451, 458; Dunn* v. *Dunn, 15 Stew. Eq. 431; Porter* v. *Bergen, 9 Dick. Ch. Rep. 405; Tate* v. *Williamson (1866), L. R. 2 Ch. App. 55, 61.*

· But there is another question inherent in the admitted facts of this case, and that is, whether the subject-matter of the supposed contract between Westervelt and Mrs. Lynde, to wit, her claim for allowance of alimony against her husband, was of such a nature as to admit of being subjected to an engagement of the kind referred to. It is obvious that if her claim was in its essence not assignable, if it was not property, nor a future interest in property, such as could be passed under an equitable assignment, the supposed contract cannot be sustained, even if made, and made under such circumstances as otherwise would entitle it to recognition and enforcement. For, if her claim was in its nature not assignable, it could not be subjected to an equitable lien by any contract between the parties. And, if any principle of public policy prohibits its assignment, the same result follows.

It is hardly necessary to say that the question thus raised is different from that in *Aspinwall* v. *Aspinwall, 4 Dick. Ch. Rep. 302; S. C., 8 Dick. Ch. Rep. 684,* which related to the liability of a husband arising from his express agreement to pay to his wife a fixed allowance during her life for support of herself and her children. Nor is this case ruled by *Bullock* v. *Bullock, 6 Dick. Ch. Rep. 444; S. C., 7 Dick. Ch. Rep. 561; S. C., 28 Vr. 508,* which had to do with proceedings in this state for enforcement of past-due alimony decreed by the court of a sister state.

An examination into the history of the allowance of alimony, and the nature and uses of alimony, will demonstrate that a claim for such an allowance is far different from a right of property. It is not a right to recover damages or compensation for injury to property or person or for deprivation of property. Nor

is it a claim for a property interest in a share of the husband's estate.

Alimony, in its origin, was the method by which the spiritual courts of England enforced the duty of support owed by the husband to the wife, during such time as they were legally separated pending the marriage relation. The courts of law could not adequately enforce this duty, but made a clumsy and circuitous attempt to do so, under some circumstances, by employing the fiction that a wife, living apart from her husband by reason of his fault, was his agent for the purpose of binding him to pay third parties for necessaries furnished to her. *Manby* v. *Scott, 2 Sm. Lead. Cas. *408; Snover* v. *Blair, 1 Dutch. 94; Vusler* v. *Cox, 24 Vr. 516.*

At the common law a divorce from the bond of matrimony was granted by the ecclesiastical courts only for such causes as rendered the marriage void *ab initio.* Naturally, alimony was not allowed as an incident to such a divorce, for, there being no marriage, the duty of maintenance had not been undertaken. *2 Bish. M. D. & S. § 855.* Divorces *a mensa et thoro,* however, amounting merely to a legal separation, were granted for causes which rendered it improper or impossible for the parties to live together, and in such case the ecclesiastical court ordered a periodical allowance to be paid by the husband to the wife for her support, the amount thereof being settled at the discretion of the judge in view of all the circumstances of the case, taking into consideration especially the wife's needs and the husband's means. The spiritual courts reserved and exercised the power of varying the amount of the alimony, from time to time, as required by change of circumstances. *1 Bl. Com. 441; 2 Bish. M. D. & S. § 828, &c.*

Divorces from the bond of matrimony were not granted by the ecclesiastical courts on the ground of adultery or for any other cause which supervened the marriage. For such causes, however, divorces were granted by act of parliament.

In this state the subject-matter of divorce having been, by statute, committed to the court of chancery, and causes for absolute divorce having been allowed other than such as rendered the marriage void *ab initio,* there followed, as a logical consequence,

the allowance of permanent alimony in cases of absolute divorce, as a means of enforcing the continuing duty of support which the husband owed to the wife, and of which he was not permitted to absolve himself by his own misconduct, although that misconduct resulted in a dissolution of the marriage.

By the act of December 2d, 1794 (*Pat. L. of 1794 p. 143*), giving jurisdiction to the court of chancery in cases of divorce and specifying the causes, it was, by section 7, provided as follows:

"That when a divorce shall be decreed on account of the parties being within the prohibited degrees, or for the cause of adultery or extreme cruelty, the chancery shall, and may, in every such divorce, take such order touching the care and maintenance of the children of that marriage, and also touching the maintenance and alimony of the wife, or any allowance to be made to her, and, if any, the security to be given for the same, as, from the circumstances of the parties, and nature of the case, may be fit, equitable and just."

On February 3d, 1818, a new act concerning divorce was passed (*P. L. of 1818 p. 20*), by which the act of 1794 and a supplement thereto, passed in 1795, were repealed. This act of 1818 materially changed the law respecting divorces, and also, for the first time, authorized a suit by the wife against the husband for maintenance (without divorce) in case of abandonment and refusal or neglect to support his wife. The section providing for permanent alimony incidental to a suit for divorce is as follows:

"SEC. 9. That when a divorce shall be decreed *on account of the parties being within the prohibited degrees, or for the cause of adultery or extreme cruelty,* it shall and may be lawful for the court of chancery to take such order touching the alimony and maintenance of the wife and also touching the care and maintenance of the children, or any of them, by the said husband, as from the circumstances of the parties and the nature of the case shall be fit, reasonable and just, and in case a wife is the complainant to order the defendant to give reasonable security for such alimony and maintenance, and upon his neglect or refusal to give such reasonable security as shall be required of him, or upon default of him and his surety, if any there be, to pay or provide such alimony and maintenance, to award and issue process for the immediate sequestration of the defendant's personal estate and the rents and profits of his real estate, and to appoint a receiver thereof and cause such personal estate, and the rents and profits of such real estate, or so much thereof as shall be necessary, to be applied towards such maintenance and allowance, or

to such maintenance or allowance as to the said court shall from time to time seem reasonable and just, or to enforce the performance of the said decree or orders by such other lawful ways and means as is usual and according to the course and practice of the court of chancery."

In the revised Divorce act of February 16th, 1820 (*P. L. of 1820 p. 43; Rev. of 1821 p. 667*), section 9 was amended by omitting the words printed in italics above; the section, as thus amended, having the effect of permitting the allowance of permanent alimony on the granting of a divorce, irrespective of the cause of divorce. Section 9, as thus revised, is substantially identical with section 19 of the revised act concerning divorces, approved March 27th, 1874. *Gen. Stat. p. 1269 (1895)*.

An examination of the statute shows clearly that alimony is imposed as a personal duty upon the husband for the personal benefit and support of the wife, or of the wife and children, in case there be children. The amount of the allowance, the method of its enforcement, the method of its application, and the security to be exacted of the husband for its payment, are all confided to the discretion of the chancellor; and he is left at liberty to increase or decrease the amount of the alimony, from time to time, according to the circumstances of the case. It will be observed that the statutory scheme is modeled closely after the practice of the ecclesiastical courts of England with reference to alimony. The purpose is to require the husband to pay to the wife periodically such sum as, in view of his circumstances and the necessities of the wife, will be a reasonable fulfillment of his continuing duty to support her. The purpose is not to enrich the wife. The ecclesiastical courts, indeed, would not ordinarily enforce arrears of alimony extending beyond a year. *De Blaquiere* v. *De Blaquiere (1830), 3 Hagg. Ec. 322*. And it was in view of the close analogy between our statutory alimony and that allowed by the ecclesiastical courts that this court held that, by force of the statute, alimony, as incidental to a divorce *a vinculo,* could not be given in a gross sum, nor in a portion of the real estate of the husband. *Calame* v. *Calame, 10 C. E. Gr. 548.* And the same view was adopted by the late Chancellor McGill, in *Lynde* v. *Lynde, 9 Dick. Ch. Rep. 476,* whose opinion was adopted by this court. *10 Dick. Ch. Rep. 591.*

48

It will be observed that in our statute alimony on a divorce *a vinculo* is placed on the same basis as that which is allowed on a divorce *a mensa et thoro*. Both are provided for by the same section of the act, and both are placed within the discretion of the court of chancery, so far as concerns their adjustment, from time to time, according to the varying circumstances of the parties. *2 Bish. M. D. & S. §§ 1038, 1048.*

It follows, as a necessary consequence of what has been said, that a wife's claim for an allowance of alimony is a purely personal right, and not, in any sense, a property right. It is, in its nature, not susceptible of assignment by the wife to another, nor capable of enjoyment by her in anticipation. And this result is fully sustained by the authorities.

In *Miller* v. *Miller, Sax. 386,* there were articles of separation binding the wife to accept a nominal sum annually for her support. Under the circumstances of the case it was held that she was not entitled to have the articles of separation set aside, but the master who heard the cause proceeded to inquire whether these articles would bar the complainant from the recovery of alimony, and he held they would not.

An examination of the English cases will be useful.

In *Stones* v. *Cook (1834), 7 Sim. 22; S. C. (1835), 8 Sim. 321, note,* Vice-Chancellor Shadwell said that the ecclesiastical court would probably allow the wife's executors to enforce payment of arrears of alimony, accrued in her lifetime, against the husband, and that, for this reason, a bill in chancery in aid of the ecclesiastical jurisdiction was not necessary. But as the case was in doubt, the learned vice-chancellor overruled the demurrer. This decision was reversed by Lord-Chancellor Lyndhurst, who took it for granted that the claim for alimony must cease with the death of the wife; that executors might maintain a suit in the ecclesiastical court, but not for arrears of alimony; and that, notwithstanding this, there was no authority to warrant the court of chancery in entertaining a bill by the wife's executors against the husband for arrears of alimony accrued prior to her death.

In *Vandergucht* v. *De Blaquiere (1838), 8 Sim. 315; 7 L. J. Ch. 270; 2 Jur. 738,* it appeared to the vice-chancellor that a married woman, living separate from her husband, after a decree of

divorce *a mensa et thoro,* and entitled to alimony under the sentence of the ecclesiastical court, had undertaken to charge future installments for payment of necessaries purchased by her. Vice-Chancellor Shadwell said: "Alimony materially differs from separate property. It is liable to be varied by the ecclesiastical court according to the husband's circumstances; whereas, separate property always remains the same, whatever alteration may take place in the circumstances of the husband." Upon this ground he refused to enforce the charge. Afterwards, however, additional proofs having been submitted, Lord-Chancellor Cottenham varied the vice-chancellor's order with respect to a portion of the fund that had been subjected to the charge, on the ground that this portion appeared not to be the fruits of alimony, leaving untouched the title to the alimony. *Vandergucht* v. *De Blaquiere, 5 Mylne & Cr. 229, 244; 3 Jur. 1116.* It should be remarked that the circumstance of the wife's disability to contract, by reason of the coverture, was not alluded to in the case, and indeed is of no consequence. In equity, and also in the ecclesiastical law, a married woman was permitted to charge her separate estate; and so the real question in the case was whether alimony was separate property such as could be charged.

*In re Robinson (1884), 27 Ch. Div. 160.* In this case it appeared that the divorce court had made a decree for a judicial separation between the parties and had ordered the husband to pay permanent alimony to the wife in monthly payments. Afterwards the husband was declared a lunatic, and, in the lunacy matter, an order was made for the payment out of his estate of an annuity to the wife, until further order, equivalent to the alimony theretofore decreed by the divorce court. After the making of this order the wife assigned the annuity to a third party, and the assignee applied by petition to have the annuity paid to him. It was held by the court of appeal that the petition must be refused, on the ground that whether the annuity was considered as alimony or as an allowance made to the wife by the court in lunacy, it was in either case not assignable. In the reasoning of the lords-justices, the decision was based on the ground that the annual recurring payments (whether consid-

ered strictly as alimony or not) were for the personal benefit of the wife, and were in their nature inalienable; that such future payments were not in the nature of property, but were payments made to the wife for her maintenance, of which she could not deprive herself by anticipation.

*Harrison* v. *Harrison* (*1888*), *13 Prob. Div. 180.* In this case a decree for dissolution of marriage had been made on the wife's petition, with an order requiring her husband to secure to her an annuity for life. It was held in the court of appeal that such an annuity, under the terms of the statute, differed from alimony in that it was not capable of being withdrawn. The annuity was therefore held to be property, such as might be subjected to a charge for the benefit of the solicitors who had recovered it, but the court of appeal refused, in the exercise of its discretion, to make the order under the circumstances of the case.

In *Watkins* v. *Watkins* (*1896*), *Prob. Div. 222,* it was held by the court of appeal that sums of money ordered to be paid by the husband for the maintenance of his divorced wife, after a divorce *a vinculo,* under authority of a statute which permitted the court to reduce the allowance fixed or discharge the order for maintenance, but not to increase the allowance, were so far analogous to the alimony of the ecclesiastical law that they should be treated as a purely personal allowance which could neither be alienated nor released so long as the order subsists. In the judgments delivered by the lords-justices, no doubt was entertained that permanent alimony, which is under the control of the court, and can be either increased, decreased or suspended at the discretion of the court, is, in its essence, inalienable.

In *Linton* v. *Linton* (*1885*), *15 Q. B. Div. 239; 54 L. J. Q. B. 529; 33 W. R. 714; 2 Morrell 179; 49 J. P. 597,* it was held in the court of appeal that future payments of alimony were not capable of being valued, and were not a "debt or liability" within the meaning of the Bankruptcy act, and so could not be proven in the bankruptcy of the husband; and that, notwithstanding his bankruptcy, he was still liable to pay the alimony.

· *In re Hawkins* (*1894*), *1 Q. B. 25; 10 R. 29; 69 L. T. 769; 42 W. R. 202; 1 Mans. B. R. 6.* It was held by the queen's bench

division that arrears of alimony which accrued after the date of a receiving order in bankruptcy, and before proof, were not provable in bankruptcy; and it was said by Vaughan Williams, J., that such arrears would not be provable whether they accrued before or after the date of the receiving order.

In *Kerr* v. *Kerr (1897), 2 Q. B. 439; 66 L. J. Q. B. 838; 77 L. T. 29; 46 W. R. 46; 4 Mans. 207,* it was held that arrears of alimony, which accrue before the making of a receiving order in bankruptcy against the husband, are not provable by the wife in bankruptcy. In this case, Vaughan Williams, J., said: "The practice of the divorce division so much treats the sums periodically payable under its order as a fund for maintenance and not as property, and so much keeps its hand on the obligation to make these periodical payments for maintenance, that it is a searching rule that the court will not, in the absence of special circumstances, make an order enforcing more than one year's arrears."

Not only does it follow, from the very nature of alimony, that it cannot be subjected in advance to a charge in favor of the solicitor through whose services it is awarded, but a like result follows from the plainest principles of public policy. According to the familiar practice of the court of chancery, the taxed costs and reasonable counsel fees of the wife are awarded against her husband. *Westcott* v. *Hinckley, 27 Vr. 343,* is an authority to the effect that there exists no legal liability upon the husband to pay such costs and counsel fees, and that they rest exclusively in the discretion of the chancellor. Applications for such allowances, as well as for alimony, peculiarly call for good faith and candor on the part of the applicant. It is a fraud on the court, and also upon the husband, for such an application to be based upon the supposed necessities of the wife, when in truth she has bartered away in advance a share of that which she is to receive. The present case furnishes a forcible illustration of the consequences that would flow from countenancing bargains made between the wife and her solicitor, with the design of appealing to the discretion of the chancellor for an allowance under the name of alimony, when in truth perhaps one-third or one-half of the entire amount (as in this case) is to be appropriated not to the

needs of the wife, but to the use of the solicitor. The chancellor here allowed a large sum for alimony, accrued between the date of the application and the final adjudication; he also allowed the usual taxed costs, and a counsel fee of $1,000. Can it be supposed that he would have allowed this counsel fee had he known that one-third at least of the accrued alimony was to be diverted to the payment of "legal expenses?" Or rather, would he not have "taken order" (to use the words of the statute) so as to insure that the alimony allowed should be devoted strictly to the purpose for which it was intended?

A case quite in point with the one now before us was that of *Jordan* v. *Westerman, 62 Mich. 170 (1886)* ; *4 Am. St. Rep. 836.* There a contract made between solicitors and client at the time the former were employed, whereby the client agreed that the solicitors should have one-half of whatever temporary or permanent alimony the court should require the defendant to pay, was held void. This decision is particularly apt as authority, because the statute law of Michigan respecting allowance of alimony *pendente lite,* and of permanent alimony as incidental to divorce, does not differ in any feature, essential to the present inquiry, from the law and practice governing alimony in this state. The contract was objected to on three grounds, viz., (*a*) that the plaintiff as a married woman was incapable of making a contract; (*b*) that the subject-matter was not capable of being assigned; (*c*) that the contract was void as against public policy. The court passed by the first of these without argument, and sustained both the other grounds of objection. The reasoning of the opinion is very able and instructive.

As we have reached the conclusion that Mr. Westervelt is not entitled to impose a lien upon the fund in question for the amount of his claim, it becomes unnecessary to consider those allegations of Mrs. Lynde's petition which relate to the power of attorney. For, whether he acquired possession of the fund fairly or not, in either case he is not entitled to retain possession of it for the purpose of enforcing his claim. It is not doubted that he has rendered services of much value to Mrs. Lynde. For these he should be paid a reasonable sum. He claims to have paid $4,900 to Mr. Bruce and Messrs. Gayley & Fleming, the

Lynde *v.* Lynde.

counsel who were concerned in the litigation. It should be stated that the case shows no ground for any criticism upon these gentlemen, and none is intimated. But, so far as appears, the amount of their fees was fixed without the approval of Mrs. Lynde being either given or asked. Moreover, she denies having authorized their employment at her expense. Supposing Westervelt has paid them the $4,900 as he claims, it remains to be determined, as between him and Mrs. Lynde, whether these fees are chargeable against her, and, if so, whether they are reasonable. Any sum she is chargeable with on that account should be taken into consideration in fixing the amount to be allowed to Westervelt for his services. In his affidavit he claims to have paid a large sum of money out of the fund in question to Mr. Ball, the New York lawyer, who introduced him to Mrs. Lynde. This payment, if made, appears to have been entirely without warrant, and is not to be credited to Mr. Westervelt as a disbursement. The bill of $2,513.21 will, of course, be the subject of inquiry. It was said upon the argument that Mrs. Lynde had, with Westervelt's consent, drawn the money upon the check for $16,086.79, after erasing the words "in full," &c. If this is true, that amount will, of course, be credited to him.

The order appealed from should be reversed, and a new order directed to be made requiring the respondent, James Westervelt, to pay forthwith into the hands of the clerk in chancery, or to such other custodian as the court of chancery may designate, the entire sum of $38,500 above referred to, after deducting the amount of counsel fees actually paid by him to Mr. Bruce and to Messrs. Gayley & Fleming (not exceeding, in the aggregate, $4,900), and deducting an amount not exceeding $2,513.21 for other disbursements and taxed costs paid by Westervelt from the fund of $38,500, or chargeable thereon, and after deducting also the amount of the $16,086.79 check sent by him to Mrs. Lynde, if it appears that she has collected the money thereon. Upon the payment being made into court, the court of chancery should then proceed, in a summary way, to ascertain and determine what is reasonable compensation for Mr. Westervelt's professional services rendered in Mrs. Lynde's behalf in the litigation above referred to, and also to inquire into the reasonableness of the fees

Lynde *v.* Lynde.

paid to Mr. Bruce and Messrs. Gayley & Fleming, and whether these are properly chargeable to Mrs. Lynde; and also to inquire into the bill of $2,513.21. From any amount found due to Mr. Westervelt there should be deducted the costs of the proceedings, including the costs of this appeal, and also such part, if any, of the $4,900 and $2,513.21 as the court may find to be properly chargeable against his compensation, or not properly chargeable to Mrs. Lynde; the balance, if any, of his compensation to be paid to him, and the residue of the fund to go to Mrs. Lynde. If, upon taking the account, the balance appears to be against Mr. Westervelt, he should, of course, be required to pay it.

Let the order appealed from be reversed, and the cause remitted to the court of chancery, to be there proceeded with in accordance with the views above expressed.

*For reversal*—DIXON, GARRISON, COLLINS, FORT, GARRETSON, PITNEY, BOGERT, ADAMS, VREDENBURGH, VOORHEES—10.

*For affirmance*—None.