## In re KELLETT AIRCRAFT CORP.

### No. 10414.

United States Court of Appeals
Third Circuit.

Argued May 7, 1951.

Decided Aug. 10, 1951.

Rehearing Denied Sept. 18, 1951.

Charles A. Wolfe, Philadelphia, Pa. (Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., on the brief), for appellant.

Joseph J. Brown, Philadelphia, Pa., for appellee.

Before BIGGS, Chief Judge, and MARIS and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This is an appeal from the decree of the district court allowing certain claims of the Coldaire Corporation ("Coldaire") in the proceedings for reorganization of the Kellett Aircraft Corporation ("Kellett") under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq.[1] A total recovery of $45,260 was allowed on the basis of the second amendment to the amended reclamation petition filed by Coldaire. $40,260 of this sum represents the amount paid by Coldaire to the debtor for certain

---

[1] A related appeal involving the same parties was before us, 3 Cir., 1949, 173 F.2d 689. As we stated in that opinion, the operative facts occurred in Pennsylvania, and the law of Pennsylvania is applicable. The factual background is set forth in that opinion and in two opinions of the district court, 1948, 77 F.Supp. 959; 1950, 94 F.Supp. 103.

tooling manufactured by Kellett for the purpose of fabricating refrigeration cabinets for Coldaire; the remaining sum, $5000, represents the value of certain engineering drawings.

To untangle the basic factual strands, we must go back to the contract of April 2, 1946, entered into by Coldaire, the Bob White Organization[2] (a partnership), and Kellett. This contract provided that Kellett was to manufacture and sell to Coldaire 12,500 refrigeration cabinets at prices set forth in the contract. The units were to be produced according to the designs, specifications, and detailed production drawings ("drawings") furnished or approved by Coldaire, which drawings were to be the property of Coldaire. Kellett further obligated itself to determine the amount of tooling which would be necessary and sufficient for production of the number of units contemplated by the contract, and it was to fabricate such tools, jigs, dies, and fixtures ("tools"). Coldaire agreed to pay Kellett the sum of $40,260 upon completion of the tools. The tools were duly fabricated and payment made by Coldaire pursuant to the contract.

All parties obviously anticipated a mutually advantageous relationship. Their hopes and plans were based upon a quick tapping of the huge pent-up demand for consumer goods in the immediate post-war era. But realization lagged behind expectation, for production never rose above a trickle. Each party asserts that the delay was the fault of the other. It is apparent, however, that in August and September of 1946, Kellett was becoming very short of working capital. On September 9, production on the Coldaire contract was suspended or terminated; all Kellett's other civilian production had been terminated by that time.

With bankruptcy or reorganization thus imminent, the parties entered into another contract on October 9, 1946. By way of recital, the contract stated that Kellett had ·

stopped production of Coldaire cabinets; that it was unable or unwilling to resume production; that Coldaire had suffered losses estimated by it to exceed $450,000; and that the parties desired to compromise and release this claim for damage and to release all parties from any further obligations under the April contract. The October contract provided that Coldaire was to purchase, at specified prices, certain raw materials, parts and work in process applicable to the production of the Coldaire cabinets. The contract gave Coldaire an option to purchase certain other raw materials and parts. It was further provided that should the Wilson Company, for whom Kellett had been producing home freezer units, or its affiliate, not desire to lease that part of the Kellett plant heretofore used for the production of Coldaire cabinets, Kellett would lease the premises to Coldaire. It was specifically provided that all designs, production drawings, etc., relating to Coldaire cabinets were to be turned over to Coldaire without any charge, but there is no reference whatsoever in the contract to the tooling. Paragraph 11 of the October contract, a mutual release clause, will be discussed later in this opinion.

Nine days after that contract was signed, trustees were appointed for the debtor in reorganization and were authorized to conduct the business. Soon afterwards, the trustees petitioned the court for permission to reject the October contract, and an order to that effect was entered. The trustees have refused to turn over to Coldaire the tools or the drawings.

Coldaire filed a proof of claim, seeking damages in the sum of $424,000 for an alleged breach by Kellett of the April contract; it also filed a reclamation petition, seeking possession of the tools. Coldaire subsequently amended its prayer for relief in the reclamation petition to seek $100,000 in damages for conversion of the tools. The special master recommended that neither claim be allowed.[3] He was of the

---

2. The contract provides that all obligations attributable to Coldaire are regarded as the joint and several obligations of Coldaire and the Bob White Organization.

3. The district court adopted the recommendations of the special master. Affirmed 3 Cir., 1949, 173 F.2d 689.

opinion that any rights Coldaire may have had under the April contract were extinguished under the October contract, which operated as an accord and satisfaction. Kellett's right to the tools was upheld by the special master on the basis of Section 26 of the Uniform Sales Act, which allows a creditor of a vendor to treat a sale as void where the seller has retained possession under circumstances constituting legal fraud. 69 Purdon's Pa.Stat.Ann. § 204.[4] The special master suggested, however, that the reclamation petition be amended to a claim for the $40,260, representing the sum paid by Coldaire to Kellett for the fabrication of the tools. Its reclamation petition was duly amended by Coldaire in accordance with the special master's suggestion. The district court adopted the special master's recommendations and allowed the amendment (the second amendment to the amended reclamation petition), recommitting the matter to the special master to allow possible defenses and setoffs.

Following a further hearing, the special master, on June 15, 1950, filed his report and recommendations with respect to Coldaire's claim for the sum paid by it for the tools. This report recommended that the claim should not be allowed because it arose out of the April contract and, as such, was released by the October contract. Upon reconsideration, however, the special master changed his recommendation, concluding that the claim should be allowed. This was set forth in the special master's supplemental report, which also recommended that Coldaire be allowed $5,000 as the value of the drawings retained by Kellett. These recommendations were adopted by the district court in its decree of December 20, 1950, and it is from that decree that Kellett has taken this appeal.

The special master and the district court were of the opinion that title to the tools vested in Coldaire when it made the agreed payment pursuant to the April contract.

While the April contract provided that Coldaire was to pay Kellett the above sum when the tools were completed, *the contract nowhere stated in whom title was to vest.* This is in marked contrast with the specific provision that the drawings were to be the property of Coldaire. The only other paragraph of the contract shedding any additional light on the problem is Article IX, the relevant part of which is as follows: "Article IX. *Delays and Termination.* (a) In the event of any arrearage in deliveries in any month resulting from any cause or causes, and Kellett's failure to make up such arrearage within one month thereafter, Coldaire may, at its option, partially terminate this contract to the extent of such arrearage by notice in writing to Kellett within ten (10) days following. * * * Kellett may, in its discretion, after the completion of the unterminated balance of this contract, complete and sell any such arrearages so terminated and *retain and use the tools provided for herein for such purpose.* * * * (b) In the event of any such default by Coldaire in any of its obligations hereunder as would entitle Kellett to terminate this contract, and termination by Kellett accordingly, Kellett may in its discretion, sell any completed units that may be undelivered at the time of such termination, and complete all work then in process and sell the resulting units. *For the purpose of completing any such work in process, Kellett shall have the right to retain and use the tools provided for herein.* * * *" (Emphasis supplied.)

It is argued by Coldaire that the clear implication of this paragraph is that title must be in it, or else why the need in the contract to specify that under the circumstances contemplated by that paragraph Kellett had the right to retain and use the tools. This argument, based on the implication derived from Article IX, is persuasive. And it may very well be that title vested in Coldaire when it made the payment pursuant to the April contract. We shall

---

**4.** "Where a person having sold goods continues in possession of the goods, or of negotiable documents of title to the goods, and such retention of possession is fraudulent in fact or is deemed fraudulent under any rule of law, a creditor or creditors of the seller may treat the sale as void." 69 Purdon's Pa.Stat.Ann. § 204. See also 11 U.S.C.A. § 110.

assume in this opinion that title vested in Coldaire upon payment.

Whether the October contract released any claim by Coldaire for the return of the $40,260 constitutes the principal question on appeal. It has already been noted that the parties, in drafting the October agreement, were completely silent with respect to the disposition of the tools. The key paragraph of the agreement is the mutual release clause, Paragraph 11. It declares: "(11) Except for the rights and obligations created hereby all contracts, claims, demands, rights, duties, obligations and liabilities existing at any time up to the time of the execution hereof between Kellett and Coldaire and/or Kellett and White are hereby mutually satisfied, discharged, and released." In the earlier appeal, 173 F.2d 689, this court held that the October contract was intended to be a substitute for the April contract, and operated as an accord and satisfaction. It is clear that if Coldaire's claim arises out of the April contract, it has been extinguished by the mutual release clause.

██ Whether Coldaire's claim does or does not arise out of the April contract is the crucial issue on this appeal. A proper construction of the October contract must depend, at least in part, on a consideration of the April contract and the relationship between the parties under it. The well-known rule of construction that a court may give consideration to the subject matter of the contract and the surrounding circumstances seems especially appropriate here. Slonaker v. P. G. Pub. Co., 1940, 338 Pa. 292, 13 A.2d 48; Ziff v. H. Daroff & Sons, Inc., 1947, 357 Pa. 326, 53 A.2d 729.

The reasoning of the special master and the district court was that since the October contract was silent on the subject of the tools, it was not intended to affect Coldaire's title. Hence, the trustees' subsequent refusal to turn over the tools to Coldaire has unjustly enriched the debtor's estate to the extent of $40,260. We cannot agree with this reasoning.

While we have assumed that title to the tools vested in Coldaire when it made the agreed payment pursuant to the April agreement, we think it important to state that the concept of legal title is not a particularly helpful one or a particularly significant one under the peculiar circumstances of this case. The tools contemplated by the April contract were expendable items—not pieces of fixed capital. It was anticipated by the parties that the tools would be used up completely, or nearly so, in the very performance of the contract. The parties were thus not overly concerned with the question of where legal title rested; hence, the April contract, even though an apparently carefully drafted one, made no mention of title. What the parties were interested in were their rights to the services of expendable tooling, and it was in these terms that they contracted. The contract obviously did not contemplate any delivery of the tools from Kellett to Coldaire, for the whole purpose of the contract was to allow Kellett to use the tools in the performance of the contract—to the mutual advantage of both parties. The subject of the contract was the production and sale to Coldaire of cabinets, not tooling. The tools were produced not for their own sake—but merely to be utilized in the production of cabinets. And the payment of the $40,260 was, realistically, a method whereby Coldaire could help in financing the venture by making prepayment on the price of the cabinets, for this payment by Coldaire was obviously reflected in a lower price paid by Coldaire to Kellett for each unit. Only if the contract were not performed would the question of title become important. It has been noted that Article IX of the April contract made some provision for the use of the tools in case of default by either party, allowing Kellett to retain and use the tools under the circumstances set forth in that paragraph.

██ Not only were the tools fabricated pursuant to the April contract, but it was in a sense the blueprint which attempted to outline the uses to which they were to be allocated during their brief existence. It seems clear that the rights of Kellett and Coldaire in the tools were among the numerous rights and obligations arising out

of the April contract. Similarly, the April contract created various rights in the drawings. The conspicuous silence of the October contract with respect to the tools should be contrasted with the manner in which the parties declared in no uncertain terms that Kellett was to turn over all drawings to Coldaire. We do not think that the silence of the October contract on the subject of the tools can be dismissed as mere inadvertence. The October contract was a wipe-the-slate contract; it was an attempt to compromise all the claims and demands arising out of their joint economic venture in the production of refrigeration cabinets. It must have been the intent of the parties that the all-inclusive release clause should extinguish all rights of Coldaire in the tools which, from the time of their fabrication, had been exclusively in the possession and control of Kellett.

Did the October contract also extinguish the right of Coldaire to recover the sum paid to Kellett for the tools?

Let us suppose that Coldaire had not entered into the October contract, but had, instead, commenced an action against Kellett for breach of the April contract. Let us further assume that Kellett had been guilty of such breach. Would the sum paid for the tools have been a proper item of damage? If the answer is in the affirmative, then the right of Coldaire to recover this sum is one of the rights released by the October contract.

■ The general rule governing damages for breach of contract is that damages are assessed to compensate the plaintiff for losses caused and gains prevented by defendant's breach, to the extent they are in excess of any savings made possible by nonperformance. Restatement, Contracts, § 329; 5 Williston on Contracts § 1338 (rev. ed.). The sum paid by Coldaire for the fabrication of the tools is certainly within this rule. Normally, such an expenditure would be recovered as an item of damage indirectly since it would be reflected in plaintiff's margin of prospective profits.[5] But should Coldaire in this hypothetical case have been unable to prove loss of expected profits, its expenditure would no doubt have been recoverable as a separate item of damage. See Restatement, Contracts, § 333, "When Damages May be Measured by Expenditures in Part Performance"; DePaolo v. DeRomo, 1943, 346 Pa. 654, 31 A.2d 158.

■ Only if the April contract be considered a severable one would the above rules be inapplicable. A realistic view of the contract necessitates the conclusion, however, that the April contract was entire in every sense of the word. We have stressed earlier in this opinion that the production of the tools and the production of the cabinets are completely and intimately inter-related. The fact that there seems to be a separate consideration for the tools should not be allowed to obscure the fact that the parties must necessarily have looked upon the contract as entire. See William P. Kelley Brick Co. v. Clay Product Supply Co., 1907, 32 Pa.Super. 408; Brown v. Exeter Machine Works, 1915, 60 Pa.Super 365.

The October contract stated by way of recital that Coldaire estimated its losses flowing from Kellett's alleged breach of contract as in excess of $450,000. In so assessing its damages, it seems clear that Coldaire had calculated all its potential loss, including the $40,260 expenditure already down the drain.[6] Thus, in entering into the October contract, Coldaire released

---

5. If Coldaire had not paid for the tools as a separate item, the cost of the tools would have been allocated, pro rata, to the cost of each cabinet, thus lowering Coldaire's margin of gross profit on each cabinet. Since the tools had been paid for, Coldaire's margin of gross profits was proportionately increased.

6. Coldaire, on January 9, 1947, filed a proof of claim in the reorganization proceedings in the amount of $424,000, which sum represented the losses claimed to have been sustained by Coldaire as a result of the alleged breach of contract by Kellett. This sum was arrived at by subtracting Coldaire's purchase price for the cabinets from its selling price, and multiplying that margin of gross profit by the number of undelivered cabinets.

its right to recover this expenditure, either directly or indirectly, as an item of damage.

 We conclude that any right of Coldaire to recover the $40,260 paid for the fabrication of the tools and any rights of Coldaire in the tools were extinguished by the October contract.

The remaining question on this appeal concerns Coldaire's claim for the value of the drawings. We have noted that the April contract provided that the drawings were to be the property of Coldaire. The mutual release clause of the October contract was not intended to relate to the drawings, since Paragraph 7 of that contract clearly stated that they were to be turned over to Coldaire. The sufficiency of the evidence introduced to prove their value is questioned by Kellett. We see no merit in this contention.

The decree of the district court will be affirmed insofar as it allows the claim of Coldaire for the value of the drawings in the amount of $5,000; the decree will be reversed insofar as it allows the claim of Coldaire for the recovery of the sum expended by it for the tooling.