**PACKARD ENGLEWOOD MOTORS,
Inc., Appellant,**

v.

**PACKARD MOTOR CAR COM-
PANY, Inc.**

**No. 11293.**

United States Court of Appeals
Third Circuit.

Argued June 11, 1954.

Decided Sept. 16, 1954.

**504**

Irving Mariash, New York City (Seufert & Elmore, Englewood, N. J.,

I. Maurice Wormser, New York City, Charles Fishberg, Englewood, N. J., on the brief), for appellant.

James D. Carpenter, Jersey City, N. J. (Carpenter, Gilmour & Dwyer, James P. Beggans, Austin B. Johnson, Jr., Jersey City, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

The plaintiff, Packard Englewood Motors, Inc., a New Jersey corporation, brought this suit against the defendant, Packard .Motor Car Company, Inc., a Michigan corporation, to recover for loss of profits sustained as a result of the defendant's alleged breach of contract. The suit was originally brought in the Superior Court of New Jersey and subsequently removed to the United States District Court for the District of New Jersey. A jury trial was waived and, after a trial by the court, judgment was entered in favor of the defendant and against the plaintiff. 116 F.Supp. 629. From the judgment so entered the plaintiff has taken the appeal now before us.

At the time of the transactions here in controversy the plaintiff was a retail dealer engaged in the sale of Packard automobiles in Englewood, New Jersey, under a dealer's sales agreement between it and the defendant, the latter being the manufacturer of Packard automobiles. At the end of 1947 the retail demand for automobiles was very great, but materials, particularly scrap cast iron, were still in short supply. The defendant, in order to increase its 1948 production of automobiles, conceived the plan of enlisting the aid of certain of its retail dealers, including the plaintiff, in securing additional scrap cast iron for its use in manufacturing cars. The plan involved offering to the cooperating dealers, as a consideration, to allot to each of them out of the increased production thus attained automobiles to sell in addition to his normal allotment on the basis of one additional or scrap bonus car for each ton

of scrap cast iron delivered by him to the defendant.

Cooperating in this plan the plaintiff shipped to the defendant 53 tons of scrap cast iron on June 26, 1948 and 44 tons on July 27, 1948, thus becoming entitled to the allotment of 97 scrap bonus automobiles in addition to its normal allotments. Of these 97 cars the plaintiff received 34, 6 in October 1948, 24 in November and December 1948 and 4 in January 1949. Seven scrap bonus cars which were alloted to the plaintiff in 1948 for delivery in January and February 1949 were ordered but later rejected. On August 25, 1949 and again on December 22, 1949 the defendant offered the plaintiff 51 scrap bonus cars. The plaintiff did not order these cars, however, and the remaining 5 of the 97 scrap bonus cars to which the plaintiff was entitled were apparently never offered to it.

It was the plaintiff's contention in the district court that the defendant was obligated to deliver all 97 scrap bonus cars in 1948. It accordingly claimed as damages its loss of profit on the sale of 63 scrap bonus automobiles which were not delivered to it in 1948.[1] The defendant contended, on the other hand, that it was not obligated to deliver scrap bonus cars at any particular time and that its offer of the cars in August and December, 1949 was therefore in full compliance with the contract. The district court, holding that such a contract as the defendant contended for would be no contract at all, concluded that the defendant's obligation would have been fulfilled by the delivery of scrap bonus cars as late as December 29, 1949, and that since the plaintiff failed to order the scrap bonus cars offered by the defendant in August and December, 1949 the latter was guilty of no breach of contract.

In order to resolve this controversy we must turn to the letters and press releases which constituted the defendant's offer to the plaintiff. The defendant's proposal was contained in a general letter to its dealers in the New York zone,[2] dated December 18, 1947, reading as follows:

"As many of you know, cast iron scrap is an extremely critical item on today's market. For lack of sufficient gray iron many cars are not being produced that could otherwise be shipped to Dealers.

"Many Packard Dealers are daily accumulating scrap in the form of cylinder blocks and other parts cast from gray iron. This, of course, is now being sold through the usual channels. However, we believe that if this material can be handled on a direct basis between Packard Dealers and the Packard Factory, production can be greatly aided.

"So sure are we of this that we are prepared to offer Packard Dealers a special inducement in return for direct purchase of their scrap cast iron. Therefore, *for each ton of scrap gray iron furnished us by a Dealer, one additional Packard car will be allotted to him*. It is, of course, necessary that this offer be restricted to Zones within a given radius from Detroit, this radius being determined by the distance at which scrap can be handled and shipped on an economical basis. The following general rules will govern this arrangement:

"1. The Dealer will accumulate such cast iron scrap as is suitable for cupola remelt. This will include iron castings of any description such as cylinder blocks, cylinder heads, manifolds, transmission cases, differential carrier cases, water pump housings, cast iron flywheels, etc.

"2. Crankshafts, camshafts, pistons, connecting rods and valves may be left in a junked engine assembly if desired, but these parts of forged steel or aluminum may not be

1. It made no claim in respect to the 4 cars delivered to and accepted by it in January, 1949.

2. Englewood, New Jersey, was in the defendant's New York zone.

thrown in separately to make up a ton. Spark plugs, generators, starting motors, carburetors, wiring harness and similar accessories *must be removed*.

"3. When a full ton of scrap iron has been collected, notify your Zone Office for instructions regarding shipment.

"4. Packard Motor Car Company will pay Packard Dealers the current Detroit market price for scrap cast iron and will pay the transportation f. o. b. the Dealer point to Detroit.

"5. With regard to car allotments, we will allot one car (over and above the regular Dealer allotment) for each full ton of scrap cast iron. If more than one ton but less than two tons of scrap is received from a Dealer, it shall be regarded as a one-ton shipment, and only one extra car will be allotted. We will, however, pay the Dealer for the full poundage received.

"6. This offer may be withdrawn at any time at the discretion of Packard Motor Car Company.

"By cooperating with us in this program, Dealers in this area will be able to obtain additional cars and at the same time help to increase production, thus directly benefiting Packard Dealers on a nation-wide basis. We feel sure that resourceful Dealers will discover ways and means to obtain for us a considerable quantity of high grade cast iron."

This proposal was further defined by subsequent letters and press releases. In a letter to dealers in the New York zone, dated December 30, 1947, the defendant's general sales manager said:

"Car allocations in return for scrap cast iron will start as soon as the increase in production resulting from the scrap receipts is realized. It should be understood, however, that we reserve the right to spread these allotments over the entire year,

should this be necessary to protect the interests of Dealers whose location prevents their participation in this program."

In a letter of the same date from the New York zone manager of the defendant to the dealers in that zone it was said:

"You are requested to supply this Zone with your best estimate of the amount of scrap you believe you can collect. We will compile this information and advise Detroit without delay.

"We are sure you realize this whole situation involves many complications. It also is obviously of vital importance to all of us and we earnestly request the full cooperation of all of you to the end the objective of building as many cars as possible during 1948 be realized."

In a press release on January 15, 1948 the general sales manager of the defendant said:

"Under the Packard plan, cooperating dealers are allotted one additional car over and above their regular receipts from the factory for each ton of scrap iron accepted and shipped to the company. The obtaining Detroit market price is paid the dealer, while the company also assumes all transportation charges.

\* \* \* \* \* \*

"The scrap collection program is designed to enable the company to augment regular sources of supply and is looked to as a means for assuring uninterrupted production of our new 1948 cars."

A letter to New York zone dealers from the assistant general sales manager of the defendant, dated April 12, 1948, stated:

"For the accomplishment already achieved we extend our sincere appreciation and thanks to participating Dealers. Further, we have begun to fulfill our obligation in the matter and to express our thanks in a more concrete form by distribution

of eight hundred additional cars to these Dealers in April and May.

\* \* \* \* \* \*

"To date we have received 2,445 tons of scrap from the Field. The balance of commitments will be absorbed within thirty days. We need an additional 5,000 tons of scrap as quickly as possible, according to information furnished us today by the Production Control Department.

"We will continue to use the method already outlined and in effect, and we ask that you renew your enthusiastic cooperation at once."

Under date of May 20, 1948, the defendant's assistant New York zone manager wrote to the dealers in that zone, as follows:

"Our Material Control Department at Detroit has informed us that, based on commitments already made by Zones and Dealers, they will have sufficient cast iron scrap to complete our 1948 production schedule.

"Negotiations now in process with Dealers will be carried through to a conclusion and shipments will be accepted after approval has been received from this Zone Office."

These were the pertinent provisions of the defendant's offer in the light of which the plaintiff shipped 97 tons of scrap iron to the defendant in June and July, 1948. There is specific evidence that the shipment of 30 tons of this scrap had been approved on May 12th and since the defendant accepted the shipments without question we may assume that negotiations with respect to the remainder had begun before the letter of May 20th was written.

One further letter comes into the picture. It was written on September 23, 1948 by the defendant's New York zone manager to the dealers of that zone and stated:

"We have information from our Central Office in Detroit on this subject which we hasten to pass on to you. I quote from this letter from Detroit, as follows:

" 'The cooperation of your dealers enabled us to build cars that otherwise would have been deleted from the schedule due to the lack of this much needed material. However, due to the generous response of our dealer organization this program was oversubscribed beyond the total tonage that we had expected to receive and for which we had set aside 22nd series cars. It is therefore necessary to allot a certain portion of the cars due these dealers in 23rd series cars. The total 22nd series allotment figures (scrap bonus cars) cover approximately sixty percent of the cars due your zone based on tonage scrap iron received and credited through August. The balance (approximately 40%) due will be allocated against 23rd series cars.'

"We wish to assure you that distribution of these scrap cars will be made to each of you on a fair-share basis, based on the amount of scrap iron that you contributed through August.

"As you receive requests from our Car Distribution Department for orders needed to cover cars we can allot to you, those cars allotted based on your quota will be so designated, and those cars allotted because of the scrap drive will also be designated. This will enable you to keep track of the scrap cars due you."

Before proceeding to consider the proper construction to be placed upon the contract thus created between the parties we must determine what law to follow. Since the district court sat in New Jersey it was, and we are, bound to apply New Jersey conflict of laws rules. Looking to the law of New Jersey we find that ordinarily reference is to be made to the law of the place of contracting to determine the obligations of

the parties.[3] Likewise we look to the conflict of laws rules of New Jersey to determine the place where the contract was made. Under the law of that state, since an informal unilateral contract of the kind here involved becomes binding when the requested act takes place, the place of contracting is where that act occurs.[4] Here the required act was the shipment of scrap iron by the plaintiff to the defendant. Those shipments were made by the plaintiff to the defendant f. o. b. freight cars in New Jersey. The act of shipment was accordingly completed in New Jersey and the resulting contracts are, therefore, to be construed under New Jersey substantive rules of contract law.

■■ Under the law of New Jersey the basic rule to be applied in the construction of such a contract is to ascertain and determine the intention of the parties, as of the time of making, as expressed by the language they employed, when read and considered as a whole and in the light of the surrounding circumstances and the purposes they sought to attain.[5] For this purpose the several letters and statements of the defendant constituting its offer to the plaintiff are to be read together as one instrument.[6]

Examining the defendant's letters and statements issued prior to June and July, 1948 in this light several things become clear. One is that the scrap cast iron which the defendant sought to obtain from its dealers was to go into the manufacture of additional automobiles in the calendar year 1948. This cooperation of its dealers was solicited "to the end. the objective of building as many cars as possible during 1948 be realized." It was to be "a means for assuring uninterrupted production of our new 1948 cars." Another is that the scrap bonus cars which the cooperating dealers were to receive were to be allotted to them out of the increased production in 1948 made possible by the scrap cast iron which they provided. Thus it was promised that "for each ton of scrap gray iron furnished us by a Dealer, one additional Packard car will be allotted to him," and it was pointed out that by cooperating "in this program, Dealers in this area will be able to obtain additional cars and at the same time help to increase production", and that "Car allocations in return for scrap cast iron will start as soon as the increase in production resulting from the scrap iron receipts is realized." It is true that the defendant stated that "we reserve the right to spread these allotments over the entire year, should this be necessary to protect the interests of Dealers whose location prevents their participation in this program."

It will be observed that the defendant's undertaking was to allot scrap bonus cars to the participating dealers, not necessarily to deliver them. This distinction takes on significance in the light of the background of the defendant's business practices. The evidence indicates that during this period it was the defendant's practice to notify each of its dealers each month of the number and models of new cars allotted to him for the following month. It may be inferred from the evidence that the allotments were based on the dealer's fair propor-

3. Hinkly v. Freick, 1914, 86 N.J.L. 281, 283, 90 A. 1108, L.R.A.1916B, 1041; James H. Rhodes & Co. v. Chausovsky, 1948, 137 N.J.L. 459, 462, 60 A.2d 623, 626; Restatement, Conflict of Laws, § 332.

4. Northampton Mutual Live Stock Ins. Co. v. Tuttle, 1878, 40 N.J.L. 476, 479; Restatement, Conflict of Laws, § 323; Goodrich on Conflict of Laws, 3d ed., Sec. 107; 2 Beale, Conflict of Laws, § 323.1; 1 Williston on Contracts, § 97.

5. Corn Exchange Nat. Bank & Trust Co. v. Taubel, 1934, 113 N.J.L. 605, 608–609, 175 A. 55, 57; Heurer v. Rubin, 1949, 1 N.J. 251, 255, 62 A.2d 812, 814; Stanbery v. Aetna Life Ins. Co., 1953, 26 N.J. Super. 498, 502, 98 A.2d 134, 136.

6. Schlein v. Gairoard, 1941, 127 N.J.L. 358, 360, 22 A.2d 539, 540–541; Schlossman's, Inc. v. Radcliffe, 1950, 3 N.J. 430, 435, 70 A.2d 493, 495; Lawrence v. Tandy & Allen, 1953, 14 N.J. 1, 6, 100 A.2d 891, 894.

tion of the current production of new cars. The dealer was required within a few days after receiving the notice of allotment to give the defendant written purchase orders for the allotted cars which he desired to take. The cars thus ordered were delivered to the dealer between a month and six weeks later. It thus appears that the allotment of cars took place at least a month before they would be delivered if ordered and that the allotment was not a sale but, in effect, an option to purchase which did not ripen into a sale unless and until the cars were actually ordered by the dealer.

We accordingly conclude that the agreement between the parties which resulted when the plaintiff made a shipment of scrap cast iron to the defendant [7] obligated the defendant to allot to the plaintiff the scrap bonus cars to which it was entitled as a result of that shipment for delivery, if ordered by the plaintiff, in the month in which automobiles produced from the supply of scrap iron to which the plaintiff's scrap had been added would be ready for delivery and in the subsequent months of the calendar year 1948, the allotments to be spread equally over those months. It will be seen that the only factor involved in determining the defendant's obligation under the agreements the extent of which is not determinable from the documents is the length of time which normally must elapse between the shipment of scrap cast iron to the defendant and the completion of deliverable cars manufactured from the scrap iron thus shipped or other scrap iron on hand when it was received. This is not clear from the present record although it is undoubtedly capable of being established by evidence.

Assuming for illustration that the time required for this purpose was six weeks the effect of the agreements resulting from the shipments of 53 tons of scrap iron on June 26, and 44 tons on July 27, 1948 would be to require the defendant to allot to the plaintiff 8 scrap bonus cars in July, 17 in August, 18 in September, 18 in October, 18 in November and 18 in December, 1948, for delivery, in each instance, in the following month, if ordered by the plaintiff.

We, of course, do not pass upon the question whether the plaintiff subsequently agreed to the modification of these agreements. The defendant calls attention to its letter of September 23, 1948 and argues that thereby the terms of its agreements with the plaintiff were modified so as to require only 60% of the scrap bonus cars to be allotted out of the 22d series cars (which the evidence indicates were delivered up to about the end of March, 1949) and to permit it to deliver 40% of the scrap bonus cars out of the 23d series cars which followed the 22d series in April, 1949. We cannot agree that the defendant could by such a unilateral act modify its obligations under its existing contracts although such a modification could, of course, be made with the plaintiff's consent. But whether such consent was given is a question of fact as to which the district court made no finding.

The defendant points to the fact that the plaintiff accepted delivery of four scrap bonus cars in January, 1949 and contends that this amounted to a waiver of the provisions of the agreement for delivery in 1948 and an acceptance of the letter of September 23, 1948. We do not agree. As we have pointed out the defendant's obligation under the agreements included a duty to allot scrap bonus cars in December, 1948 for delivery, if ordered, in 1949. Here, since the four cars in question were allotted in 1948, the fact that they were delivered in 1949 is without significance. Likewise the fact that the plaintiff cancelled orders for seven cars which it had

7. Since each shipment constituted an acceptance of the defendant's offer it is clear that each shipment resulted in a separate agreement for the allotment of scrap bonus cars to the shipping dealer which must be considered independently of the others in determining the defendant's obligations.

**510**

ordered in December, 1948 is immaterial since its refusal to take particular allotted cars can have no bearing on its right to be allotted the remaining scrap bonus cars to which it was entitled. Of course, the plaintiff could not recover damages with respect to cars properly allotted to it under the agreements but which it failed to purchase.

Since our construction of the agreements between the parties differs from that placed upon them by the district court the case must go back to that court for a new trial. Upon remand the district court should afford the plaintiff an opportunity to amend its complaint to conform to the agreements as we have construed them.

 Since the court has made no findings upon the question of damages we need not consider that subject.[8] It may be useful to point out, however, that if upon the new trial the plaintiff establishes a breach of the agreements by the defendant it will be entitled to compensatory damages to the extent that the evidence affords a sufficient basis for a finding that it suffered a loss of profits as a result thereof and for estimating that loss with reasonable certainty,[9] and that in any event it would be entitled to nominal damages.[10]

The judgment of the district court will be reversed and the cause will be remanded for further proceedings not inconsistent with this opinion.

8. It appears that under the conflict of laws rules of New Jersey the law of the place of performance of a contract determines the measure of damages for its breach. Healy v. Gorman, 1836, 15 N.J.L. 328; Swetland v. Swetland, 1930, 105 N.J.Eq. 608, 617, 149 A. 50, 54. This is also the generally accepted rule. Restatement, Conflict of Laws, § 413; Goodrich, Conflict of Laws, 3d ed., p. 255. Here the plaintiff was to be notified at its place of business in New Jersey of the allotments of scrap bonus cars made to it under the agreement. The damages, if any, to which the plaintiff is entitled are, therefore, to be determined under the law of New Jersey.

9. Feldman v. Jacob Branfman & Son, 1933, 111 N.J.L. 37, 41–42, 166 A. 126, 127, 128; Casler v. Weber, 1953, 27 N.J.Super. 396, 399, 99 A.2d 537, 538. See Restatement, Contracts, § 331(1), and New Jersey annotations thereto.

10. Furniture Co. v. Board of Education, 1896, 58 N.J.L. 646, 647, 35 A. 397; Van Schoick v. Van Schoick, 1908, 76 N.J.L. 242, 244, 69 A. 1080, 1081; Car & General Ins. Corporation v. Davimos, 1934, 12 N.J.Misc. 569, 173 A. 150, affirmed 114 N.J.L. 192, 176 A. 320. See Restatement, Contracts, § 328, and New Jersey annotations thereto.