Thomas GRAY

v.

JOSEPH J. BRUNETTI CONSTRUC-
TION CO., Inc., Appellant.

No. 12659.

United States Court of Appeals
Third Circuit.

Argued Nov. 18, 1958.

Decided April 24, 1959.

Aaron Heller, Passaic, N. J. (Heller & Laiks, Passaic, N. J., on the brief), for appellant.

Thomas P. Ford, Jr., Newark, N. J., (Thomas W. Clohosey, Newark, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge and McLAUGHLIN and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

Defendant, Joseph J. Brunetti Construction Co., Inc., a New Jersey corporation, engaged in construction of apartment houses, appeals from a judgment rendered by the District Court of New Jersey in favor of plaintiff, Thomas Gray, Washington, D.C. attorney and resident of Virginia.

The judgment was in an action based on a written contract for legal services entered into by the parties which provided for payment of a fixed fee of $12,000, not in controversy, and a contingent fee of $13,000.

The case is one in federal court by reason of diversity. It was tried to a jury. At the conclusion of plaintiff's case both

parties moved for a directed verdict. Defendant's motion was denied; decision on plaintiff's motion was reserved. At the conclusion of defense testimony, the Court withdrew the case from the jury on the ground that construction of the contract was for the Court. At the same time it stated that it would treat the parties' earlier motions as motions for judgment. Subsequently the Court held [1] that defendant was not entitled to a directed verdict but that plaintiff was entitled to a judgment for the contingent fee, reserving, however, the right of the defendant to introduce evidence to the Court, sitting in equity and without a jury, for the purpose of determining the reasonableness of the contingent fee arrangement.

Thereafter, defendant submitted proof as to the reasonableness of the $13,000 contingent fee, and, after consideration, the Court entered judgment for plaintiff for $7,500, holding that sum to be reasonable.[2]

Defendant's appeal is based on these grounds: the District Court erred (1) in its construction of the contract; (2) in allowing plaintiff a $7,500 contingent fee and (3) in refusing to permit the jury to construe the contract and determine the issues.

These facts are undisputed:

Brunetti was engaged in the construction of apartment house projects which were financed by mortgages insured by the Federal Housing Administration ("F.H.A."), known as the "Title 608 program." Prior to May 27, 1955, the date of the retainer agreement here involved, F.H.A. launched investigations of its mortgage loans to builders and instituted proceedings against some of them to (1) "roll back" rents and/or procure refunds of past rental payments to tenants, (2) obtain refund of "windfall" profits, and (3) effect repayment of loans between parent and subsidiary building and operating companies. Defendant was aware of the action taken by F.H.A.

with respect to other so-called 608 builders and consulted its local counsel, Walter Van Riper concerning its own situation. Joseph J. Brunetti, president of defendant, and its sole stockholder, had testified before the Senate Banking and Currency Committee with respect to its operations under the 608 program. Defendant felt that it would be advantageous to engage Washington, D.C. counsel to assist Van Riper in an anticipated dispute with F.H.A. and sought the services of plaintiff, who had been employed as one of counsel by F.H.A. for some thirteen years during 1938 to 1946 and 1948 to 1953, and was at the time in private practice, specializing in housing law and F.H.A. matters. Plaintiff, in response to Brunetti's request, came to Newark, New Jersey in the latter part of April or early in May, 1955 and conferred with Mr. Brunetti, Monroe Bober, defendant's secretary, Van Riper and a Mr. Apfel, defendant's accountant. In mid-May, in response to Bober's summons, plaintiff came to Newark for a conference in Van Riper's office with those earlier mentioned and was at that time retained as "behind-the-scenes" Washington counsel for defendant. Subsequently plaintiff and Mr. Brunetti met and agreed upon the terms and scope of plaintiff's representation. Later, plaintiff and Bober drafted a letter dated May 27, 1955, memorializing the oral agreement, which was signed by plaintiff and Mr. Brunetti, in behalf of defendant, on May 31st.

Subsequently, Van Riper actively represented defendant in its dispute and negotiations with F.H.A. In accordance with the intentions of the parties, plaintiff remained in the background but throughout informed defendant and Van Riper, via telephone and letters, of developments with respect to activities of F.H.A. in 608 situations generally, and specifically advised them in connection with their negotiations with F.H.A. Conferences were held between defendant's representatives and plaintiff in his

1. Gray v. Joseph J. Brunetti Construction Company, Inc., D.C.N.J.1958, 159 F. Supp. 417.

2. Gray v. Joseph J. Brunetti Construction Corp., Inc., D.C.N.J.1958, 161 F.Supp. 151.

Washington office and in New Jersey. In September, 1955 plaintiff advised defendant with respect to demands made by F.H.A. that directors and officers of several of its subsidiaries resign to make way for F.H.A. appointees. In November, 1956 F.H.A. wrote defendant demanding, in settlement of its various claims, payment of $90,000 in reduction of mortgages of its subsidiaries. Indicative of the "behind-the-scenes" activity of plaintiff is the fact that, according to defendant, he informed it of the F.H.A. letter "a few days before that letter was mailed." [3]  Later, in December, 1956, plaintiff advised defendant and Van Riper to make the settlement proposed by F.H.A. and "of certain other things which were more important in our making of a decision".[4]  Defendant made the settlement and plaintiff then demanded payment of his $13,000·contingent fee. Defendant refused to pay and plaintiff brought suit.

3. With respect to that incident Monroe Bober, defendant's secretary, testified as follows (N.T. pp. 62–63) :

"Q. Now, when you received that final letter, you just spoke about, from the F.H.A., turning down your proposition unless you paid the $90,000.00, was the fact communicated to Mr. Thomas Gray, the plaintiff in this case?

"A. *Well, actually, sir, Mr. Gray knew that that letter was going to come to us before we even got it, and it was a few days before that letter was mailed that Mr. Gray spoke to me on the phone at length about the situation with respect to the F.H.A.* We had agreed in November, *among ourselves, Mr. Gray, Judge Van Riper, and myself,* that the $90,000.00 that the F.H.A. was demanding would be acceptable to us if we did not have to apply it as we did to reduction of mortgages. * * *" (Emphasis supplied.)

4. On this score Bober testified as follows (N.T. pp. 62–63) :

"Early in December, and as my records and memory recall, it was on December 7, I spoke to Mr. Gray who was in Washington, and he advised me, as he had Judge Van Riper by letter, that the $90,000.00 was not bad, as he put it, in light of the stiffening attitude that the F.H.A. had been taking. *He also advised me of certain other things which*

The letter constituting the contract on which plaintiff's suit was based reads as follows:

"Joseph J. Brunetti Construction
Co., Inc.
"95 Essex Street, Maywood,
New Jersey
"May 27, 1955

"Mr. Thomas Gray
"1720 'Eye' Street, N.W.
"Washington 6, D.C. .

"Dear Sir:

"This letter is written to confirm the oral understanding reached between yourself and the writer with respect to your professional services.

"You are to be retained by us to assist our counsel and ourselves in properly preparing and defending ourselves against any action of the Federal Housing Administration or its agents, or any agency of government acting in behalf of the Federal

*were most important in our making of a decision.*

"Mr. Gray advised me that Mr. Wolf, who was the chief counsel for the F.H.A. and who had been doing the negotiations with us, had tendered his resignation and was leaving either January 1 or February 1 of 1956. He felt that if we got an unfavorable answer to our letter of November 28 to the F.H.A. asking that this money not be applied against mortgages, that, in that event, since this man that we had been doing business with was about to step out of the picture, then we would have to start all over again, going through this whole rigamarole of discussions and fighting and everything else; *he thought we should accept the Settlement. He so advised me.* As I understand, his advice was further communicated to Judge Van Riper.

"Q. Mr. Bober, as a result of the payment to the mortgagees of the $90,000.00, did the F.H.A. drop the action of compelling the meeting for the purpose of the resignation of officers and directors?

"A. Yes, he did.

"Q. Did they drop any further action against your company?

"A. They dropped all the threatened actions that they had implied against us, by writing us a letter accepting our offer of settlement.

"Q. That was due to the fact that you paid the $90,000.00, is that correct?

"A. Yes." (Emphasis supplied.)

Housing Administration, in attempting to:

"A. Roll back rents and/or cause a refund of past rents to tenants.

"B. Cause a refunding of profits (FHA terminology 'windfalls').

"C. Cause loans between parent and subsidiary corporations to be repaid.

"D. Be successful in any other action, no matter what the allegation in accomplishing A, B, or C.

"It is understood that you will devote all the time required to assist both ourselves and our counsel in these matters.

"Upon the signing of this agreement, we shall pay you $3,000 as a retainer.

"For the year starting June 1, 1955, we shall pay you $750.00 per month.

"In the event that we are *successful in avoiding* litigation *or* in the event that we are *successful in litigation in preventing* the Federal Housing Administration, its agents or agencies of the government, as aforesaid, from causing any of *the aforementioned items to occur*, then we shall pay you an additional $13,-000. Should the government be successful in the taking over of our corporations and setting up their own Board of Directors, your work shall include the assistance to us and counsel in preventing the government from accomplishing A, B, or C, during their period of direction, and also to assist us in having these corporations returned to our control in the fastest period of time. *Should we not be successful in any one of the counts, you will not be entitled to receive the aforementioned $13,000.*

"*It is understood that your monthly fee shall cease at the end of the year whether or not the matter has been brought to a successful conclusion. Your services will continue, however, after the year is up, and you shall only be entitled to receive*

*from us the $13,000 mentioned above in the event of ultimate success on our part.*

"We agree to reimburse you for out-of-pocket expenses undertaken at our request.

"Should all of the above be in accordance with our agreement, please sign this letter in the space provided below, retain the original for your files, and permit us to keep a duplicate copy.

"Very truly yours,

"Joseph J. Brunetti Construction Co., Inc.

"/s/ Joseph J. Brunetti,
"Joseph J. Brunetti
"President

"JJB:MB:NF

"Accepted: /s/ Thomas S. Gray

"Dated: May 31, 1955." (Emphasis supplied.)

It is admitted that the foregoing letter embodies the entire contract between the parties and that plaintiff had performed the services for which he was paid the $3,000 retainer and $9,000 in twelve monthly payments of $750.00 each between June 1, 1955 and May 1, 1956.

Defendant here contends, inter alia, that the contract was ambiguous with respect to its contingent fee provisions and that its construction was accordingly a jury question; that the District Court erred in taking the question from the jury.

■■ As long ago as 1805, Mr. Chief Justice Marshall stated, in Levy v. Gadsby, 3 Cranch 180, 186, 7 U.S. 180, 186, 2 L.Ed. 404: " * * * no principle is more clearly settled, than that the construction of a written evidence [contract] is exclusively with the court." It is also settled that "Whether the written contract fully expressed the terms of the agreement * * *." is a question for the court. Seitz v. Brewers' Refrigerating Machine Company, 1891, 141 U.S. 510, 517, 12 S.Ct. 46, 48, 35 L.Ed. 837.

■ Further, it is settled that "Facts and circumstances attendant at the time the contract was made are competent

evidence for the purpose of placing the court in the same situation, and giving the court the same advantages for construing the contract which were possessed by the actors." Good v. Martin, 1877, 95 U.S. 90, 95, 24 L.Ed. 341. In In re Kellett Aircraft Corp., 1951, 191 F.2d 231, 235 we noted: "The well-known rule of construction that a court may give consideration to the subject matter of the contract and the surrounding circumstances * * *."

■ In the instant case the District Court acted in consonance with the decisions cited in taking the construction of the contract from the jury inasmuch as it had correctly determined after considering it that it was free from ambiguity.

■ Before proceeding to consider the proper construction to be placed on the contract we must determine what law to follow. This case is in Federal Court solely by reason of diversity. The Federal Court takes its applicable rule of law from the state courts of the District in which it sits and this, of course, includes its conflict of laws references to laws of other states where they are relevant. Accordingly, the District Court in the instant case was constrained, as we are, to apply the conflict of laws rule of New Jersey. The New Jersey conflict of laws rule is that ordinarily reference is to be made to the law of the place of contracting in construing the contract and determining the obligations of the parties. Packard Englewood Motors, Inc. v. Packard Motor Car Co., 3 Cir., 1954, 215 F.2d 503, 507; Wilson v. Homestead Valve Manufacturing Co., 3 Cir., 1954, 217 F.2d 792, 797, certiorari denied 349 U.S. 916, 75 S.Ct. 606, 99 L.Ed. 1250; Fairbanks, Morse & Co. v. Consolidated Fisheries Co., 3 Cir., 1951, 190 F.2d 817, 820; Hinkly v. Freick, 1914, 86 N.J.L. 281, 90 A. 1108, L.R.A.1916B, 1041; James H. Rhodes & Co. v. Chausovsky,

1948, 137 N.J.L. 459, 462, 60 A.2d 623, 626; Restatement, Conflict of Laws § 332 (1934).

The contract was made in New Jersey and involved performance on the part of the contracting parties in both Washington, D.C. and New Jersey. As the District Court put it, it provided, as far as plaintiff was concerned, that he was to act " * * * as an on-the-spot look-out [in Washington] and practical advisor in the interest of the defendant and the latter's New Jersey counsel." The District Court found that "In the performance of such functions the plaintiff reported to the defendant or its counsel [in New Jersey] from time to time by telephone, letter or in person"; "Conferences were held by defendant's representatives with the plaintiff at Washington and in New Jersey * * *" and "It was the intention of both parties that plaintiff should remain in the background during the negotiations between defendant, its counsel and the [Federal Housing] Administration." 159 F.Supp. 417, 422.

In view of the fact that the plaintiff was engaged, under the contract, " * * to assist our [defendant's] counsel and ourselves [defendant] in properly preparing and defending ourselves against any action of the Federal Housing Administration * * *" and such assistance, via plaintiff's advice, was communicated to defendant and/or its counsel in New Jersey it is a fair conclusion that performance was largely centered in the state of New Jersey. Taking into account that fact and the making of the contract in New Jersey the conclusion is justified that New Jersey law is applicable in matters relating to the construction of the contract.[5]

■ In construing integrated contracts the New Jersey courts permit introduction of parol evidence as to " * *

5. Even though by reason of partial performance in Washington, D.C. consideration should be given to standards of construction there prevailing, the result would be the same since the New Jersey rule of construction is in accord with the Federal rule. Good v. Martin, 1877,

95 U.S. 90, 95, 24 L.Ed. 341. "The question of whether an ambiguity exists in a contract is one of law to be determined by the court." Friedman v. Thomas J. Fisher & Co., D.C.Mun.App.1952, 88 A.2d 321, 323, 31 A.L.R.2d 827.

the relation of the parties and the circumstances under which the contract was made, and the objects which the parties were thereby striving to accomplish * * * not for the purpose of changing the writing, but to secure light by which to ascertain its actual significance." Corn Exchange National Bank & Trust Co. of Philadelphia v. Taubel, 1934, 113 N.J.L. 605, 609–610, 175 A. 55, 58. Restatement Contracts, 230 (1932).

The New Jersey rule was spelled out in Atlantic Northern Airlines, Inc. v. Schwimmer, 1953, 12 N.J. 293, 96 A.2d 652, 656:

"Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, *in the quest for the intention*, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. * * *" (Emphasis supplied.)

■ Applying the principles stated we find no error in the holding of the District Court that this was an integrated contract and in its consideration of evidence of surrounding circumstances. Indeed, defendant does not here contend that the District Court erred in considering such evidence; it merely asserts that the Court erred in its evaluation and its construction of the contract in the light of it, and further, in refusing to permit the issue as to both to go to the jury. There is no basis for defendant's contentions. The District Court properly refused to leave to the jury the construction of the contract in view of its correct holding that this was an integrated contract, free of any ambiguity. Further, its construction of the contract and evaluation of the evidence as to "surroundings" is amply sustained by the record.

There remains for consideration the question as to the allowance of the contingent fee of $7,500.

It would serve no useful purpose to review in detail the District Court's holding that the plaintiff was entitled to a contingent fee under his contract with defendant. As stated, the contract was free of any ambiguity. It provided that the fixed contingent fee of $13,000 would be paid in the event of defendant's "ultimate success" in its disputes with F.H.A. The phrase "ultimate success" referred to "avoiding litigation" or "litigation" which might develop. Defendant by paying $90,000 in reduction of the mortgages of its subsidiaries settled its disputes with F.H.A. and "avoided litigation".

As the District Court put it (159 F. Supp. 417, 422, 423):

"For the purpose of buying its peace and thereby avoiding litigation, defendant succeeded in negotiating a settlement with the Administration [F.H.A.] involving a payment of $90,000 in the form of a refund of 'windfall' profits. The accomplishment of its compromise with the Administration has rendered successful defendant's efforts to avoid litigation, and thereby created the condition precedent to plaintiff's right to payment of the contingent fee as provided in the contract. Defendant's 'ultimate success' entitling the plaintiff to receive the additional $13,000 is found in its relief from the types of previously threatened consequences of action by the Administration.

"The Court finds, therefore, that defendant was 'successful in avoid-

ing litigation' with the Federal Housing Administration respecting actions taken or threatened by it as contemplated by the parties to the agreement here in suit. Efforts toward the achievement of such ultimate avoidance of litigation were among the professional obligations which plaintiff assumed under the contract. It is obvious that the parties contemplated that such efforts might have to be continued beyond the period during which the attorney would be entitled to receive the monthly payments on account of his retainer. Indeed, they did extend to November, 1956. It is not to be assumed that the parties intended that such further services, if successful, should be unrewarded. * * *"

The record discloses that the area of dispute between defendant and F.H.A. embraced loans of more than $1,100,000 made to the defendant by its subsidiaries which F.H.A. contended were in violation of law; refunding of more than a $1,000,000 of asserted construction profits or "windfalls" (the excess of the amount of mortgages insured by F.H.A. over the actual cost of the projects securing the mortgages),[6] and, a refund of past rents, and a roll-back of future rents, calculated by the plaintiff to amount to $194,000 annually over the life of the mortgages insured by F.H.A.

Plaintiff testified that the amounts in controversy were considered by the parties in the determination of his contractual fees. In response to defendant's request that he "describe the circumstances that surrounded the fee arrangement you made in connection with this contract with the Joseph J. Brunetti Construction Company", he said (N.T. p. 85):

"At the time of the discussion of the contract in Judge Van Riper's office, in which Mr. Bober ended the conversation very early, and previous to that conversation I was told that there was something in the neighborhood of $1,300,000 in windfalls, something in excess of $1,000,000 in loans—

"Mr. Heller [defendant's counsel]: May I interrupt the witness? He said he was told. Was it by these people?

"The Witness [plaintiff]: By Mr. Apfel—Mr. Bober confirmed—by Mr. Brunetti, something in excess of $1,000,000 in loans, and $200—in excess of $200,000 a year in rent, two items of which I confirmed with information which I already had by virtue of having followed the windfall investigations and the testimony in Washington before the Senate. *It was with respect to those amounts that the discussion was held in connection with a fee * * *"* (Emphasis supplied).

In its opinion, 161 F.Supp. 151, 154, the District Court made the fact-finding that " * * * the agreement was arrived at after apparent complete disclosure and full consideration and there was no fraudulent or unfair conduct on the part of the attorney [plaintiff]." It specifically noted (at page 155) that Mr. Brunetti, defendant's sole stockholder, who had directly negotiated with plaintiff the scope and terms of his reprsentation had " * * * offered no testimony respecting the circumstances surrounding the manifested mutual assent of the parties leading to the achievement of the agreement, the correctness of the written embodiment of the agreement which he personally signed in his official capacity [as president], or of the fairness or reasonableness of the amounts required to be paid in accordance with the terms thereof." Mr. Brunetti's failure to testify, "despite his conceded availability", said the District Court, supported an in-

---

6. Defendant, through its secretary, Monroe Bober, denied that more than $1,000,000 in "windfalls" was involved. He testified that "The questionnaires that we then proceeded to deliver to the F.H.A. showed a windfall on the companies that we still owned * * * of $236,135.55 on 18 of the corporations. It was a consolidated questionnaire. With respect to one single other corporation, there was a windfall of $10,215.83."

ference that his testimony "if given * * * would have been unfavorable * * * " to defendant.

With respect to the fee allowed, the District Court, after observing that it " * * * had the benefit of expert testimony respecting the issue of reasonableness of the contingent fee. * * * " said (at page 155):

"* * * an additional fee of $7,500 appears to afford, in the Court's opinion, generous compensation to the plaintiff for the services which the Court finds that he rendered to the defendant under the contract in suit."

We are of the opinion that the record amply sustains the District Court's fact-findings that the contract was fairly made and the plaintiff performed the services it contemplated.

The District Court's reduction of the $13,000 contingent fee specified in the contract presents a problem not considered by the District Court or the parties. It arises by reason of the fact that both the District Court and the parties assumed[7] that "summary jurisdiction" existed with respect to the contingent fee since plaintiff is an attorney and under New Jersey law the courts of that state are vested with such jurisdiction over attorney's fees because attorneys " * * * are officers of the respective courts in which they practice." Lynde v. Lynde, E. & A.1902, 64 N.J.Eq. 736, 52 A. 694, 697, 58 L.R.A. 471; Hughes v. Eisner, 1951, 14 N.J.Super. 58, 81 A.2d 394, 397.[8]

There is nothing in the record to establish that plaintiff had been admitted to practice, or practiced in the New Jersey state courts.[9] The testimony discloses that plaintiff is a member of the state of Georgia and District of Columbia bars. The circumstance that one is an attorney does not automatically qualify him to practice before courts to which he has not been admitted. Since he was not admitted to practice in the New Jersey state courts he was not an officer of the courts mentioned and there was a lack of summary jurisdiction to review his contractual contingent fee under New Jersey law.

Moreover, since the plaintiff had not been admitted to practice before the court below, it lacked independent jurisdiction to exercise the " * * * autonomous control over the conduct of their officers" which inure to federal courts. Theard v. United States, 1957, 354 U.S. 278, 281, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342, because it is well settled that attorneys are only officers of the federal courts to which they have been admitted to practice. Ex parte Bradley, 1869, 7 Wall. 364, 367, 74 U.S. 364, 367, 19 L.Ed. 214.[10]

Even though the issue was not raised, "a lack of jurisdiction in the district court over the subject matter" requires us to reverse the District Court's action in reviewing and reducing plaintiff's contingent fee. In Peoria & Pekin Union R. Co. v. United States, 1924, 263 U.S. 528 at pages 535–536, 44 S.Ct. 194, at page 197, 68 L.Ed. 427 the Court said:

"If there were a lack of jurisdiction in the district court over the subject-matter, we should be obliged to take notice of the defect, even if not urged below by the appellee. * * * "[11]

---

7. Plaintiff assumed the District Court in the exercise of its equitable jurisdiction could act with respect to the contingent fee; defendant assumed below, and here contends, that the jury could, and should have passed on the issue.

8. See also Soper v. Bilder, 1917, 87 N.J. Eq. 564, 100 A. 858 and Steiner v. Stein, 1949, 2 N.J. 367, 66 A.2d 719.

9. In his brief plaintiff stated that he was "an officer" of the New Jersey courts but that statement is evidently based on his mistaken conception that an attorney is "an officer" of any and all courts even though he has not been admitted to practice before them.

10. In Spilker v. Hankin, 1951, 88 U.S.App. D.C. 206, 188 F.2d 35, at page 37 it was said: "In a very real sense attorneys are officers of the courts in which they practice * * *."

11. We are cognizant of the line of cases which hold that an appellee " * * * can be heard * * * only in support of

This too must be said.

██ This was in the nature of an action at law and necessarily so because a suit by an attorney against his client to recover on a contingent fee contract had to be brought at law and could not be maintained in equity. See Trist v. Child, 1875, 21 Wall. 441, 447, 88 U.S. 441, 447, 22 L.Ed. 623.

██ Once it was found by the District Court in its construction and consideration of the contract that it was fairly made after full consideration of the impact of its terms upon the parties, and that its terms had been performed by plaintiff, he was entitled to judgment for the $13,000 contingent fee provided by the contract.

The New Jersey law is well-settled and explicit in this respect.

In the leading case of Kupfersmith v. Delaware Insurance Co., 1913, 84 N.J.L. 271, 275, 86 A. 399, 401, 45 L.R.A.,N.S., 847 it was said:

> "The law will not make a better contract for parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the other. The judicial function of a court of law is to enforce a contract as it is written."

In affirming the principle stated, the Superior Court of New Jersey, Chancery Division, in the recently decided case of Leeds and Lippincott Co. v. Nevius, 1958, 51 N.J.Super. 343, 144 A.2d 4, 10 said:

> "The rule is firmly established that the parties are bound by the agreement which they have made." [12]

The New Jersey rule is in accord with that prevailing in other jurisdictions.[13]

██ The New Jersey courts, even in equity proceedings, " * * * may not justly invoke the extraordinary power of declining to enforce the fairly executed * * * agreement of the parties solely because the material benefits afforded to the defendant presently appear to be rather meager." DeCaro v. DeCaro, 1953, 13 N.J. 36, 97 A.2d 658, 662, 42 A.L.R.2d 1312.

██ It must be observed, parenthetically, that the District Court erred in still another respect in reducing plaintiff's contingent fee even assuming it enjoyed summary jurisdiction with respect to it. It is settled New Jersey law that attorney-client contracts for contingent fees " * * * should not be carved away by the court except in an entirely clear case." Hughes v. Eisner, supra [14 N.J.Super. 58, 81 A.2d 397], and, in the absence of unfairness or fraud, where there has been performance by the attorney, the contract " * * * ought not be disturbed by the court, but the parties should be left where they have placed themselves." Grimm v. Franklin, 1928, 102 N.J.Eq. 198, 140 A. 236, 239, affirmed E. & A. 1929, 110 N.J.Eq. 573, 146 A. 914.

Here the District Court found fairness, absence of fraud, and performance

---

the decree which was rendered." Peoria & Pekin Union R. Co. v. United States, 1924, 263 U.S. 528, 535, 44 S.Ct. 194, 197; Helvering v. Pfeiffer, 1937, 302 U.S. 247, 251, 58 S.Ct. 159, 82 L.Ed. 231; Morley Construction Co. v. Maryland Casualty Co., 1937, 300 U.S. 185, 57 S. Ct. 325, 81 L.Ed. 593, rehearing denied 300 U.S. 687, 57 S.Ct. 505, 81 L.Ed. 888, but they did not present any jurisdictional issue.

12. Other New Jersey decisions, citing and applying Kupfersmith v. Delaware Insurance Co. are: Smith v. Fidelity & Deposit Co. of Maryland, 1923, 98 N.J.L. 534, 120 A. 322, 323; Jorgenson v. Metropolitan Life Ins. Co., 1947, 136 N.J.L. 148, 55 A.2d 2, 4.

13. Harnish v. Shannon, 1958, 392 Pa. 419, 141 A.2d 347, 351; Stinson v. New York Life Ins. Co., 1948, 83 U.S.App.D.C. 115, 167 F.2d 233, 235; 17 C.J.S. Contracts § 417; 12 Am.Jur., Contracts, § 184; 3 Williston on Contracts, § 620, p. 1788 (1936). The rule was concisely stated by Williston as follows:

"But the mere fact that parties have made an improvident bargain will not lead a court to make unnatural implications or artificial interpretations. A court will not under the guise of interpretation write a new contract for the parties."

of the terms of the contract, and (assuming jurisdiction) should have left the contract undisturbed.

In summary, we find that the District Court correctly found that the contract was not ambiguous and accordingly properly took its construction from the jury; that it did not err in its construction of the contract and in its fact-finding that it has been fairly negotiated and performed; that the Court, in reducing the contingent fee, erred in exercising a "summary jurisdiction", which it did not possess; it further erred in not entering judgment for plaintiff for his contractual contingent fee of $13,000.

For the reasons stated the judgment of the District Court will be reversed and the cause remanded with instructions to proceed in accordance with this opinion.